# United States Court of Appeals for the District of Columbia Circuit

HUMANE SOCIETY OF THE UNITED STATES; HUMANE SOCIETY LEGISLATIVE FUND; PAULINE STOTSENBERG; JANA BABUSZCZAK; WILLIAM COON; KRISTI QUAINTANCE,
*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE; ANIMAL AND PLANT HEALTH INSPECTION SERVICE; OFFICE OF THE FEDERAL REGISTER; THOMAS J. VILSACK, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE UNITED STATES DEPARTMENT OF AGRICULTURE; KEVIN SHEA, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE ANIMAL AND PLANT HEALTH INSPECTION SERVICE; CHARLEY BARTH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE OFFICE OF THE FEDERAL REGISTER,
*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Columbia
No: 1:19-cv-02458-ESH

## CORRECTED PAGE PROOF BRIEF OF APPELLANTS HUMANE SOCIETY OF THE UNITED STATES; HUMANE SOCIETY LEGISLATIVE FUND; PAULINE STOTSENBERG; JANA BABUSZCZAK; WILLIAM COON; and KRISTI QUAINTANCE

Kimberly D. Ockene
Ralph E. Henry
THE HUMANE SOCIETY OF THE
UNITED STATES
1255 23rd Street, NW
Washington, DC 20037
(202) 285-1388
kockene@humanesociety.org

August 27, 2021

Caroline A. Flynn
L. Allison Herzog
Roman Martinez
Julia A. Hatcher
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
caroline.flynn@lw.com

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certifies the following:

## A.    Parties And Amici

Plaintiffs in the district court, and appellants here, are the Humane Society of the United States, the Humane Society Legislative Fund, Pauline Stotsenberg, Jana Babuszczak, William Coon, and Kristi Quaintance.  Defendants in the district court, and appellees here, are the United States Department of Agriculture; the Animal and Plant Health Inspection Service; the Office of the Federal Register; Thomas J. Vilsack, in his official capacity as Secretary of the United States Department of Agriculture; Kevin Shea, in his official capacity as Administrator of the Animal and Plant Health Inspection Service; and Charley Barth, in his official capacity as Director of the Office of the Federal Register.  There were no other parties, intervenors, or amici before the district court, and no intervenors or amici have appeared in this Court.

**B.    Rulings Under Review**

Appellants seek review of the July 27, 2020 opinion and order of the United States District Court for the District of Columbia. *See Humane Soc'y of the U.S. v. U.S. Dep't of Agriculture*, 474 F. Supp. 3d 320 (D.D.C. 2020) (Huvelle, J.), reproduced at JA__-__.

**C.    Related Cases**

This case has not previously been before this Court or any other court (other than the district court). Counsel for appellants are not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

Date: August 27, 2021                              Respectfully submitted,

                                                   */s/ Caroline A. Flynn*
                                                   Caroline A. Flynn

Kimberly D. Ockene                                 L. Allison Herzog
Ralph E. Henry                                     Roman Martinez
THE HUMANE SOCIETY OF THE                          Julia A. Hatcher
UNITED STATES                                      LATHAM & WATKINS LLP
1255 23rd Street, NW                               555 Eleventh Street, NW
Washington, DC  20037                              Suite 1000
(202) 285-1388                                     Washington, DC  20004
kockene@humanesociety.org                          (202) 637-2200
                                                   caroline.flynn@lw.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, appellants Humane Society of the United States and Humane Society Legislative Fund certify that they do not have parent corporations, and no publicly held corporation has a 10% or greater ownership interest in either entity.

Date: August 27, 2021

Respectfully submitted,

*/s/ Caroline A. Flynn*

Kimberly D. Ockene
Ralph E. Henry
THE HUMANE SOCIETY OF THE
UNITED STATES
1255 23rd Street, NW
Washington, DC  20037
(202) 285-1388
kockene@humanesociety.org

Caroline A. Flynn
L. Allison Herzog
Roman Martinez
Julia A. Hatcher
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
(202) 637-2200
caroline.flynn@lw.com

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellants request oral argument. The district court dismissed appellants' action based on incorrect rulings on important issues of administrative law. Exploration of these issues at oral argument would assist the Court in rendering its decision.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ........................................ iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................iv

TABLE OF AUTHORITIES ................................................. vii

GLOSSARY ........................................................... xiii

INTRODUCTION ..........................................................1

STATEMENT OF JURISDICTION...........................................4

STATEMENT OF THE ISSUES............................................4

PERTINENT STATUTES AND REGULATIONS........................4

STATEMENT OF THE CASE.............................................5

      A.    Background .................................................5

           1.    The Horse Protection Act...........................................5

           2.    The 2016-2017 Rulemaking .................................7

           3.    USDA Withdraws The Final Rule ...........................12

      B.    Procedural History.................................................15

SUMMARY OF ARGUMENT ..............................................19

STANDARD OF REVIEW ..............................................22

ARGUMENT ..........................................................22

I.    USDA VIOLATED THE ADMINISTRATIVE PROCEDURE ACT WHEN IT REVOKED THE FINAL RULE ...............................22

      A.    The Final Rule Was Issued When It Was Approved By The Agency And Released To The Public .................................24

B.    Nothing In the APA Conditions A Rule's Validity On Federal Register Publication ..............................................................32

C.    Precedent Confirms That USDA Issued The Final Rule Before Withdrawing It ....................................................................37

D.    The District Court's Analysis Was Wrong .........................42

II.    THE OFFICE OF THE FEDERAL REGISTER ACTED UNLAWFULLY IN ALLOWING USDA TO WITHDRAW THE FINAL RULE FROM PUBLICATION ........................................................48

CONCLUSION ......................................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Action on Smoking & Health v. Civil Aeronautics Board,*
713 F.2d 795 (D.C. Cir. 1983).......................................................................2, 23

*American Petroleum Institute v. Costle,*
609 F.2d 20 (D.C. Cir. 1979)........................................................................38, 39

*\* Arlington Oil Mills, Inc. v. Knebel,*
543 F.2d 1092 (5th Cir. 1976) .....................................................................40, 41

*Bennett v. Spear,*
520 U.S. 154 (1997)...........................................................................................24

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020).......................................................................................30

*Brotherhood of Locomotive Engineers & Trainmen v. Federal
Railroad Administration,*
972 F.3d 83 (D.C. Cir. 2020).............................................................................24

*Chen v. INS,*
95 F.3d 801 (9th Cir. 1996) .........................................................................46, 47

*Clean Air Council v. Pruitt,*
862 F.3d 1 (D.C. Cir. 2017)........................................................................37, 47

*Consumer Energy Council of America v. FERC,*
673 F.2d 425 (D.C. Cir. 1982), *aff'd,* 463 U.S. 1216 (1983) ......................22, 23

*Council of the Southern Mountains, Inc. v. Donovan,*
653 F.2d 573 (D.C. Cir. 1981)...........................................................................47

*Encino Motorcars, LLC v. Navarro,*
136 S. Ct. 2117 (2016).......................................................................................23

\* Authorities upon which appellants chiefly rely are marked with asterisks.

                                                                    **Page(s)**

*Environmental Defense Fund, Inc. v. Gorsuch,*
    713 F.2d 802 (D.C. Cir. 1983)................................................................47

*FCC v. AT&T Inc.,*
    562 U.S. 397 (2011)........................................................................34

\* *Kennecott Utah Copper Corp. v. United States Department of the*
    *Interior,*
    88 F.3d 1191 (D.C. Cir. 1996)................................. 18, 21, 26, 42, 43, 44, 45, 47

*Kessler v. FCC,*
    326 F.2d 673 (D.C. Cir. 1963)..............................................................37

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
    523 U.S. 26 (1998).........................................................................50

*Merck & Co. v. United States Department of Health & Human*
    *Services,*
    962 F.3d 531 (D.C. Cir. 2020).............................................................46

\* *National Association of Manufacturers v. NLRB,*
    717 F.3d 947 (D.C. Cir. 2013), *overruled in part on other grounds*
    *by American Meat Institute v. United States Department of*
    *Agriculture,* 760 F.3d 18 (D.C. Cir. 2014) .................................................39, 40

*National Environmental Development Association's Clean Air Project*
    *v. EPA,*
    752 F.3d 999 (D.C. Cir. 2014)..........................................................48, 49

*National Federation of Independent Business v. Sebelius,*
    567 U.S. 519 (2012).......................................................................36

\* *Natural Resources Defense Council, Inc. v. Perry,*
    940 F.3d 1072 (9th Cir. 2019) .......................................................21, 41, 44, 47

*Nielsen v. Preap,*
    139 S. Ct. 954 (2019)......................................................................36

\* *Saturn Airways, Inc. v. Civil Aeronautics Board,*
    476 F.2d 907 (D.C. Cir. 1973)..........................................................38, 39

*Tearney v. National Transportation Safety Board*,
    868 F.2d 1451 (5th Cir. 1989) ...................................................38

*United States v. Aarons*,
    310 F.2d 341 (2d Cir. 1962) .............................................28, 33, 37

*United States v. Board of Commissioners*,
    435 U.S. 110 (1978)..........................................................29

*United States v. Floyd*,
    477 F.2d 217 (10th Cir. 1973) .............................................38

*United States v. Mowat*,
    582 F.2d 1194 (9th Cir. 1978) .............................................38

*Walters v. Metropolitan Educational Enterprises, Inc.*,
    519 U.S. 202 (1997)..........................................................27

*Western Organization of Resource Councils v. Zinke*,
    892 F.3d 1234 (D.C. Cir. 2018)..........................................22

*Zhang v. Slattery*,
    55 F.3d 732 (2d Cir. 1995) ...............................................47

## CONSTITUTIONAL, STATUTUTORY AND REGULATORY PROVISIONS

U.S. Const. amend. XX, § 1......................................................52

5 U.S.C. § 551(4) ................................................................22

5 U.S.C. § 551(5) ................................................................22

5 U.S.C. § 552 ...............................................................17, 32

5 U.S.C. § 552(a) ..........................................................33, 44

5 U.S.C. § 552(a)(1)...........................................................33

5 U.S.C. § 552(a)(1)(D) ......................................................33

5 U.S.C. § 553 .........................................................17, 32, 35

**Page(s)**

5 U.S.C. § 553(b) ..................................................................22, 35

5 U.S.C. § 553(c). .......................................................................35

5 U.S.C. § 553(d). .......................................................................35

5 U.S.C. § 706 ........................................................................4, 16

5 U.S.C. § 706(2)(A) ..............................................................23, 49

15 U.S.C. § 1821 *et seq.* ..............................................................6

15 U.S.C. § 1823(c) ......................................................................6

15 U.S.C. § 1823(e) ......................................................................6

15 U.S.C. § 1824(1) ......................................................................6

15 U.S.C. § 1824(2) ......................................................................6

15 U.S.C. § 1825 ..........................................................................6

15 U.S.C. § 1828 ......................................................................6, 25

28 U.S.C. § 1291 ..........................................................................4

28 U.S.C. § 1331 ..........................................................................4

44 U.S.C. § 1501 ........................................................................28

44 U.S.C. §§ 1501-09 .................................................................27

44 U.S.C. § 1503 ....................................................12, 26, 28, 29, 49

44 U.S.C. § 1504 ........................................................................26

44 U.S.C. § 1505 ........................................................................17

44 U.S.C. § 1505(a) ....................................................................26

44 U.S.C. § 1507 ....................................................18, 20, 27, 29, 44

44 U.S.C. § 1507(1) ....................................................................27

**Page(s)**

Pub. L. No. 74-220, 49 Stat. 500 (1935) ................................................................26

Pub. L. No. 79-104, 60 Stat. 237 (1946) ...............................................................36

1 C.F.R. § 17.1 ...............................................................................................12, 26

1 C.F.R. § 17.2 ........................................................................................3, 26, 49

1 C.F.R. § 17.2(b) .........................................................................12, 49, 50, 51

1 C.F.R. § 17.2(c) ...............................................................................................12, 50

1 C.F.R. § 17.7(a)(1) ..........................................................................................51

1 C.F.R. § 18.13(a) .............................................................................................52

9 C.F.R. § 11.1 ....................................................................................................7

9 C.F.R. § 11.2(a)-(c) ..........................................................................................7

9 C.F.R. § 11.7 ...............................................................................................6, 7

9 C.F.R. § 11.7(a)(2) ...........................................................................................7

9 C.F.R. § 11.20 ..................................................................................................6

9 C.F.R. § 11.20(a) ..............................................................................................7

9 C.F.R. § 11.20(b) ..............................................................................................7

9 C.F.R. § 11.21(d) ..............................................................................................7

9 C.F.R. § 11.25 ..................................................................................................7

## OTHER AUTHORITIES

81 Fed. Reg. 65,307 (Sept. 22, 2016) ..................................................................9

82 Fed. Reg. 8346 (Jan. 20, 2017) ................................................................13, 52

85 Fed. Reg. 37,160 (June 19, 2020) ...................................................................30

*Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act* (1967)........................................34

*Black's Law Dictionary* (11th ed. 2019)................................................25

Centers for Medicare & Medicaid Services, Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority (2020), https://www.federalregister.gov/d/2020-11758 ...................31

\* *Federal Register Act—Date of "Promulgation" of Law Enforcement Assistance Administration Regulations*, 1 Op. O.L.C. 12 (1977)..................................................20, 29, 37, 44

H.R. Rep. No. 89-1497 (1966)..............................................................34

Alice Higgins, *Woe for Walkers*, Sports Illustrated (July 23, 1956) ........................5

National Academies of Sciences, Engineering, and Medicine, *A Review of Methods for Detecting Soreness in Horses* (2021)........................15

Robert Newman, *The Effectiveness of an Unpublished Rule*, 1995 Ann. Surv. Am. L. 1 (1995) ......................................................30

Office of the Federal Register, *Federal Register Document Drafting Handbook* (Oct. 1998 rev.), https://open.defense.gov/Portals/23/Documents/Regulatory/ ddh.pdf ................................................................................52

\* *Questions Arising in the National Archives Establishment Under the Federal Register Act*, 38 Op. A.G. 359 (1935)................................20, 28, 29, 44

S. Rep. No. 88-1219 (1964) ..................................................................34

*Webster's New International Dictionary* (1923) ....................................27

*Webster's Third New International Dictionary* (1971) ..........................25

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| APHIS | Animal and Plant Health Inspection Service |
| FOIA | Freedom of Information Act |
| FRA | Federal Register Act |
| HHS | U.S. Department of Health and Human Services |
| OFR | Office of the Federal Register |
| USDA | U.S. Department of Agriculture |

# INTRODUCTION

This case presents a fundamental question of administrative procedure: When does an agency rule finalized by the agency actually become law? In this case—at the culmination of notice-and-comment rulemaking—the U.S. Department of Agriculture (USDA) formally approved a "final rule" overhauling the agency's prior regulations enforcing the Horse Protection Act. USDA published the full text of that final rule on its official government website with an accompanying news bulletin. It transmitted the rule to the Office of the Federal Register (OFR) for publication. And on January 19, 2017, OFR made the rule available for public inspection.

But on January 23, 2017—following a presidential transition—USDA abruptly changed course. Pursuant to a "regulatory freeze memorandum" issued by the new administration, USDA withdrew the document on the eve of its publication in the Federal Register on January 24. As a result, the district court in this case held that the USDA rule never was "final" and legally binding on the agency.

That was wrong. The governing federal statutes, longstanding Executive Branch interpretation, and this Court's precedent all point in the same direction: USDA's final rule was issued once the agency approved the rule and made its contents public. That is the moment when—according to the text of the Federal Register Act—USDA's rule was legally "valid." Opinions from the Attorney General and the Department of Justice Office of Legal Counsel agree that USDA's

rule was properly promulgated on that date. And this Court and others have likewise held, across a variety of contexts, that agency rules should be deemed issued and valid when the agency formally approves the rule and communicates its contents to the public. Indeed, the government took that stance *just last year*: It told a different court that an agency rule was "final" and "issued" when the rule was posted on the agency's website and made available for public inspection, even before the rule was published.

Here, however, the government Defendants have taken the opposite view. They have argued (and the district court agreed) that a rule is not finalized until it is actually published in the Federal Register. But as Defendants readily admit, "there is no question that an agency may enforce a pre-publication rule" under some circumstances—namely, when the regulated party had actual notice of the rule's contents. Defs.' MTD Reply 14, Dkt. 25 (internal quotation marks omitted). In other words, according to Defendants, Federal Register publication is an absolute condition for a rule to be valid and enforceable—except when it's not. But "[t]he agency cannot have its proverbial cake and eat it too." *Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 800 (D.C. Cir. 1983) (per curiam). And the district court's similar attempt to thread that needle—by holding that a nonpublished rule is legally operative *only* if the agency says it is—is equally arbitrary and unworkable. It leads to the absurd and self-contradictory conclusion that an

unpublished regulation can be both (1) enforced against parties with notice (because it has become law), and (2) revoked by the agency without notice and comment (because it has not yet become law). Such a holding will only lead to confusion and agency overreach.

Because USDA's final rule was properly issued—by the latest—on January 19, 2017, USDA was not free to repeal the rule without a new round of notice and comment and a reasoned explanation for its change in position. Neither of those things happened. Making matters worse, OFR committed a legal violation of its own. OFR inexplicably scheduled the USDA rule for publication a day late, in violation of the plain terms of its mandatory scheduling regulation, 1 C.F.R. § 17.2. Because this unexplained scheduling deviation gave the new presidential administration an opportunity to withdraw the rule, the regulatory violation directly brought about Plaintiffs' harm.

This is hardly an academic debate. Because of USDA's caprice, the agency has left in place a regulatory regime it has already acknowledged is "not adequately . . . promoting enforcement" of a landmark animal-cruelty law. 81 Fed. Reg. 49,112, 49,113 (July 26, 2016) ("Proposed Rule") (JA__). The regulatory changes that USDA promulgated in January 2017 are—in the agency's own words— "necessary" to end the inhumane practice of horse soring. *Id.* at 49,115 (JA__). The agency cannot be permitted to forsake those regulations now, based on a self-

aggrandizing legal theory at odds with the relevant statutes and established Executive Branch interpretation. This Court should reverse the district court and allow Plaintiffs' action to proceed.

## STATEMENT OF JURISDICTION

Plaintiffs assert claims against Defendants under the Administrative Procedure Act (APA), 5 U.S.C. § 706. The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331. On July 27, 2020, the district court issued an opinion and order granting Defendants' motion to dismiss all claims. JA__; JA__ ("Op."). On September 23, 2020, Plaintiffs filed a timely notice of appeal of that final judgment. JA__. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether USDA violated the Administrative Procedure Act when it revoked its final rule without notice and comment or a reasonable explanation for the agency's change in position.

2. Whether OFR violated 1 C.F.R. § 17.2 by delaying the publication of the USDA final rule and subsequently allowing USDA to withdraw the rule, and whether Plaintiffs have Article III standing to bring a claim on that basis.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutory and regulatory provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Background

#### 1.     The Horse Protection Act

This case involves a USDA rulemaking to enforce the Horse Protection Act, a landmark animal-cruelty law meant to eradicate the practice of "horse soring." Horse soring is the inhumane practice of inflicting pain on a horse's limbs and forefeet, with the aim of causing the horse to lift its legs higher when it steps. Compl. ¶ 1 (JA__). Soring is typically accomplished by applying a blistering agent to the horse's leg and then wrapping the leg area with "action devices"—such as chains, boots, beads, collars, or metal rollers—or by placing painful objects under the hooves. Compl. ¶¶ 49, 52 (JA__, __). Because these caustic agents and devices cause the horse intense pain when it places its forefeet on the ground, it lifts its feet up quickly and shifts its weight to its hind legs—producing the distinctive "high-stepping gait" prized by some Tennessee Walking Horse and racking horse exhibitors. Compl. ¶¶ 1, 47-49 (JA__, __). Trainers often conceal soring through the use of bands, hoof pads, pain-masking agents, or substances that obscure scars. *Id.* ¶ 49 (JA__).

After animal welfare groups and the media brought widespread attention to the "torture" and "disgraceful cruelty" of horse soring in the 1950s and 60s, Alice Higgins, *Woe for Walkers*, Sports Illustrated (July 23, 1956), Congress took action.

In 1970, Congress passed the Horse Protection Act, closely followed by the Horse Protection Act Amendments of 1976 (together the "Horse Protection Act" or the "Act"). *See* 15 U.S.C. § 1821 *et seq.* The Act prohibits exhibition or sale of sore horses or transporting sore horses with reason to believe that they may be sold or exhibited. *Id.* § 1824(1)-(2). Violations may be met with civil and criminal penalties. *Id.* § 1825.

The Act vests USDA with general rulemaking authority. *Id.* § 1828. It specifically tasks USDA with the responsibility to prescribe "requirements for the appointment by the management of any horse show . . . of persons qualified to detect and diagnose a horse which is sore or to otherwise inspect horses for the purposes of enforcing this chapter." *Id.* § 1823(c). USDA also has its own inspection power. *Id.* § 1823(e). USDA has delegated these authorities to the Animal and Plant Health Inspection Service (APHIS), a subagency.

USDA promulgated regulations to implement the Horse Protection Act in 1979, and the last substantive revisions (before the rulemaking at issue here) were in the 1990s. Compl. ¶¶ 57-58 (JA__-__). Those regulations required horse show management (called "Horse Industry Organizations") to license and appoint "designated qualified persons"—i.e., private inspectors—to enforce the soring ban at their shows. 9 C.F.R. §§ 11.7, 11.20. These private inspectors, who were not required to be veterinarians, were responsible for "identifying" horses that are sore

6

and other violations of the Act. *Id.* § 11.20(b); *see also id.* § 11.7. The show managers, in turn, were responsible for disqualifying such horses from competition and assessing penalties. *Id.* §§ 11.20(a)-(b), 11.21(d), 11.25. In addition, the regulations prohibited action devices at horse shows "if such use causes or can reasonably be expected to cause such horse to be sore"; they also prohibited a set of specific action devices (like chains of a certain weight) and the use of "substances" on the horse's extremities, with some exceptions. *Id.* §§ 11.1, 11.2(a)-(c).

2. The 2016-2017 Rulemaking

Tragically, USDA's regulatory regime failed to eliminate the inhumane practice of horse soring. *See* Compl. Ex. A, USDA, Horse Protection; Licensing of Designated Qualified Persons and Other Amendments 3 (JA__) ("Final Rule") (USDA acknowledging that "[d]uring the intervening decades" since the Horse Protection Act's passage, "substantial noncompliance continues to exist"). This is due to two significant flaws in the regulations' design. First, the regulations allowed the industry to regulate itself. Horse show management could appoint whomever they liked as inspectors so long as those individuals are "knowledgeable horsemen." 9 C.F.R. § 11.7(a)(2). Inspectors are often other trainers, owners, or exhibitors (or their relatives), who have clear incentives to not rigorously enforce the Horse Protection Act; they might not get hired as inspectors in other shows, and they are wary of penalizing exhibitors who might be inspecting their own horse at a future

show.  Proposed Rule, 81 Fed. Reg. at 49,115 (JA__); *see also* USDA Office of the Inspector General, Audit Rep. 33601-2-KC, *Animal and Plant Health Inspection Service Administration of the Horse Protection Program and the Slaughter Horse Transport Program* 10-11 (Sept. 2010) ("Inspector General Report") (JA__-__).  As a result—and as detailed in a 2010 report by the USDA Office of the Inspector General, which followed a multi-year investigation of over one thousand horse shows—the regulatory regime had "inherent conflict[s] of interest" and resulted in dramatic under-enforcement.  Inspector General Report at 2, 10 (JA__, __).

Second, the regulations contained numerous loopholes.  Compl. ¶¶ 70-71, 74, 77 (JA__-__, __).  Many action devices that are used to carry out or conceal soring were not banned outright.  Dane Decl. ISO MTD Opp. ¶¶ 13-14 (JA__); Proposed Rule, 81 Fed. Reg. at 49,117 (JA__).  Similarly, because the regulations still allowed the use of lubricants on the horse's extremities, it was difficult to readily discern when an impermissible substance had been applied.  *See* Dane Decl. ISO MTD Opp. ¶¶ 13-14 (JA__); Proposed Rule, 81 Fed. Reg. at 49,117-18 (JA__).  As a result, APHIS continued to detect "a high incidence of prohibited substances, principally irritants and numbing and masking agents" through post-show chemical testing. Final Rule at 48 (JA__).

Following the Inspector General Report, and "[i]n response to public concerns about the ability of APHIS' Horse Protection Program to detect and prevent soring,"

USDA published a proposed rule on July 26, 2016 overhauling its Horse Protection Act regulations. Proposed Rule, 81 Fed. Reg. at 49,113 (JA__). USDA "agree[d] with the [Inspector General]'s conclusion that the current program . . . [wa]s not adequately detecting soring or promoting enforcement of the Act" and that changes were "necessary" to "achieve the Act's purpose of ending the soring of horses." *Id.* at 49,115 (JA__). Accordingly, USDA proposed fundamental improvements to its enforcement regime. These included having APHIS assume the training and licensing of inspectors, and prohibiting outright a greater number of action devices, hoof pads, and substances. *Id.* at 49,113, 49,115, 49,117 (JA__, __, __).

In fall 2016, USDA extended the proposed rule's comment period. 81 Fed. Reg. 65,307, 63,308 (Sept. 22, 2016). The agency received over 130,000 written comments on the proposed rule. Final Rule at 7 (JA__). USDA also gathered stakeholder input at four public hearings in Tennessee, Kentucky, California, and Maryland, as well as a virtual hearing. *Id.* The agency received input from state and federal elected officials, agricultural agencies, farm bureaus, horse industry organizations, veterinarians, animal welfare organizations, and horse owners and trainers. *Id.* at 7-8 (JA__-__).

Then, on January 11, 2017, USDA leadership approved a "final rule" amending the Horse Protection Act regulations. Compl. ¶ 93 (JA__); *see* Final Rule (JA__-__). Consistent with the proposed rule, the Final Rule made a number of

significant improvements to the prior regulatory scheme. Crucially, it replaced the inherently conflicted industry-selected-inspector system with APHIS-licensed and trained inspectors. Final Rule at 5, 7 (JA__, __). Under this new regime, APHIS would enforce conflict-of-interest requirements, screen candidates, and oversee the inspectors' performance. *Id.* at 141-45 (JA__-__). The Final Rule also required that inspectors be veterinarians, veterinary technicians, or other animal welfare specialists. *Id.* at 141 (JA__). In addition, the Final Rule imposed a complete ban on the use of nearly all action devices and substances—making detection of soring and enforcement far easier. *Id.* at 5, 9-10, 23-24, 122-27 (JA__, __-__, __-__, __-__).

The Final Rule explained that all of its provisions would go into effect January 1, 2018, with the exception of two sections, which would be effective "30 days after [the] date of publication in the Federal Register." *Id.* at 2 (JA__).[1] And the Final Rule stated that it was "Done in Washington, DC this 11th day of January 2017," and the original contains the signature of David Howard, the USDA Acting Deputy Under Secretary for Marketing and Regulatory Programs. Compl. Ex. B at 149 (JA__).

---

[1] Those two sections were the new ban on action devices and the elimination of horse show management's current responsibility for training and licensing inspectors. Final Rule at 122-27, 140-45 (JA__-__, __-__).

On January 13, 2017, USDA published a PDF of the Final Rule on its official website.  Compl. ¶¶ 82-83 (JA__-__).  It also published an accompanying "bulletin" titled "USDA Announces Changes Aimed at Ending the Inhumane Practice of Horse Soring."  Compl. ¶ 82 (JA__); Compl. Ex. C (JA__-__).  The January 13 bulletin stated that APHIS "today announced a *final rule* that includes changes that will help to protect horses from the cruel and inhumane practice known as soring."  Compl. Ex. C at 1 (JA__) (emphasis added); *see also id.* (calling the rule a "final regulation").  The bulletin also relayed the substance of the Final Rule in a detailed, five-point bulleted list.  *Id.* at 1-2 (JA__-__).  And it explained that "[t]his final rule will be publish[ed] in the Federal Register in the coming days" and that the "rule" had already been "submitted" to OFR.  *Id.* at 2 (JA__).

Upon USDA's announcement of the Final Rule, the media and the horse industry immediately spread the news.  For instance, a widely-read industry website, thehorse.com, posted an article titled "Chains, Stacks Banned in Walking Horse Training, Exhibition" that described the "'new USDA [] rule.'"  Compl. ¶ 90 (JA__) (alteration in original) (citation omitted).  Several industry websites also provided links to the Final Rule's text.  *Id.* ¶ 92 (JA__).  Reaction from stakeholders was swift.  On January 14, Senator Lamar Alexander of Tennessee, who had opposed the proposed rule, issued a press release lamenting that USDA had "finalized a rule"

banning action devices and requiring USDA-licensed inspectors. *Id.* ¶ 89 (JA__-__).

### 3. USDA Withdraws The Final Rule

On or around Monday, January 16, 2017, USDA submitted the Final Rule to OFR to be published in the Federal Register. Compl. ¶ 93 (JA__). Per OFR regulations, agency documents must be processed and published in accordance with a "regular schedule." 1 C.F.R. § 17.2(b); *see also* 44 U.S.C. § 1503 (requiring OFR to act "immediately" once a document is received). The document must be processed by OFR, filed for "public inspection" two business days after receipt, and then formally published in the Federal Register the next business day. 1 C.F.R. § 17.2(b), (c); *see also id.* § 17.1. Under that regular schedule—and assuming OFR did not treat the Final Rule as submitted until Tuesday, January 17—the Final Rule should have been filed for public inspection on Thursday, January 19, and published on Monday, January 23 (due to January 20 being a federal holiday).

OFR did post the Final Rule for public inspection on January 19. Compl. ¶ 93 (JA__). But OFR incorrectly assigned the Final Rule a publication date of Tuesday, January 24. *Id.* OFR gave no explanation for its decision to deviate from the required schedule. *Id.* ¶¶ 93, 120-21 (JA__-__, __-__).

President Donald J. Trump was inaugurated at noon on January 20, 2017. That same day, his chief of staff issued a memorandum to agency heads titled

"Regulatory Freeze Pending Review." *Memorandum for the Heads of Executive Departments and Agencies*, 82 Fed. Reg. 8346 (Jan. 20, 2017) ("Regulatory Freeze Memo"). The Regulatory Freeze Memo directed agencies to "immediately withdraw" any regulations that "have been sent to the OFR but not published in the Federal Register." *Id.* at 8346. At the same time, the memo instructed agencies that "[t]his withdrawal must be conducted consistent with OFR procedures." *Id.*

On Monday, January 23, APHIS's Chief of Regulatory Analysis and Development submitted a letter to the OFR Director asking him to "withdraw from publication" the rule "currently on public inspection and scheduled to publish in the Federal Register on January 24, 2017." Compl. ¶ 95 & Ex. D (JA__, JA__). OFR complied and did not publish the Final Rule. Compl. ¶ 96 (JA__). OFR subsequently updated its "Public Inspection Issue" for January 19, 2017 to read: "Editorial Note: APHIS requested the withdrawal of this document after it was on public inspection." *Id.*

Sometime between January 24 and February 2, 2017, USDA edited the January 13 bulletin on its website. *Id.* ¶¶ 7, 97 (JA__, __); *see* Compl. Ex. E (JA__). The bulletin was still titled "USDA Announces Changes Aimed at Ending the Inhumane Practice of Horse Soring," and it continued to explain that "[o]n January 13, APHIS announced a final rule, making changes to the Horse Protection Act regulations." Compl. Ex. E (JA__). But the webpage no longer linked to the Final

Rule. Compl. ¶ 97 (JA__). And the revised text of the bulletin stated: "That final rule has been withdrawn, in accordance with a memorandum issued to Federal agencies January 20." Compl. ¶ 97 & Ex. E (JA__; JA__). At no point before or after withdrawing the Final Rule did USDA provide notice and an opportunity for comment. Compl. ¶ 95 (JA__).

In March 2018, following multiple attempts to engage the agency, the Humane Society of the United States wrote to USDA regarding the Final Rule's status. *Id.* ¶ 99 (JA__-__). In his May 7, 2018 response, APHIS Administrator Kevin Shea acknowledged that the Final Rule was on the agency's "list of inactive actions"; he noted that "USDA has taken meaningful steps to reduce regulatory burdens on the American people" in accordance with President Trump's directives. Compl. Ex. F at 3 (JA__). Administrator Shea further explained that APHIS had elected to "promote [Horse Protection Act] compliance" through measures other than the Final Rule. *Id.* at 4 (JA__). In February 2019, the United States Equestrian Federation again wrote to USDA to urge the agency to publish the Final Rule. Compl. ¶ 100 (JA__). On April 18, 2019, Secretary Sonny Perdue responded that "continuing" with the agency's existing enforcement initiatives "will bring us closer to achieving the [Act]'s . . . purposes." *Id.*

Unsurprisingly, in the years since the agency's about-face, the widespread practice of horse soring has continued. According to APHIS enforcement reports,

the number of violations was almost twice as high in 2018 as in 2017. Compl. ¶ 103 (JA__-__). It is likely that this increase in documented violations greatly understates the extent of the problem.[2]  In 2017 and 2018, 58% and 66% of "Big Lick" horses continue to test positive for banned chemicals, respectively. *Id.* ¶ 105 (JA__-__) (citing APHIS reports). And in January 2021, the National Academies of Sciences, Engineering, and Medicine released a major report once again confirming that industry inspectors often conduct improper and inadequate examinations for soring. National Academies of Sciences, Engineering, and Medicine, *A Review of Methods for Detecting Soreness in Horses* 2-11 (2021).

## B.    Procedural History

Plaintiffs are the Humane Society of the United States, the Humane Society Legislative Fund, Jana Babuszczak, Pauline Stotsenberg, William Coon, and Kristi Quaintance. The Humane Society and the Humane Society Legislative Fund have long campaigned to end the abusive practice of soring as part of their fundamental mission to advocate for the humane treatment of animals. Dane Decl. ¶¶ 4-5, 7-9, 15 (JA__-__); *see* Letterman Decl. ISO MTD Opp. ¶¶ 3-9 (JA__-__). The individual plaintiffs (themselves Humane Society members) participate in the walking horse

_____

[2]  Industry inspectors are almost three times as likely to issue citations when APHIS veterinary medical officers are present at the show (and APHIS officers attend only a small fraction of shows). Compl. ¶¶ 103-04 (JA__-__). Exhibitors frequently leave shows when APHIS personnel are present. *Id.* ¶ 103 (JA__).

industry as spectators, judges, or competitors who show or breed horses. Babuszczak Decl. ISO MTD Opp. ¶¶ 2-4, 6-13, 17-21 (JA__-__); Quaintance Decl. ISO MTD Opp. ¶¶ 2-7, 9-15 (JA__-__); Coon Decl. ISO MTD Opp. ¶¶ 5, 7-8, 11-13 (JA__-__); *see also* Final Rule at 1-2, 5, 6, 20 (JA__-__, __-__, __) (explaining that the rule was meant to "eliminate unfair competitive advantage that sore horses have over horses that are not sore").

In 2019, Plaintiffs filed this action in the U.S. District Court for the District of Columbia challenging the Final Rule's withdrawal. They argued that USDA revoked duly issued regulations without notice and comment and without providing a reasoned explanation for the agency's change in position, in violation of the APA. Compl. ¶¶ 106-13 (JA__-__). Plaintiffs also challenged OFR's deviation from the mandatory publication schedule in 1 C.F.R. § 17.2. *Id.* ¶ 120 (JA__).[3] As a remedy, Plaintiffs requested declaratory relief, vacatur of USDA's revocation of the Final Rule, vacatur of OFR's compliance with USDA's withdrawal request, and an injunction compelling publication of the Final Rule. *Id.* at pp. 44-45 (JA__-__); *see* 5 U.S.C. § 706.

Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). They argued that Plaintiffs lacked standing to bring their claims, on

---

[3]   Plaintiffs also brought additional challenges that are not at issue in this appeal.

the theory that Plaintiffs could not show that reinstatement of the Final Rule would actually eliminate horse soring.  On the merits, Defendants argued that because the Final Rule had not been published in the Federal Register—as the Federal Register Act (FRA) and the APA require, *see* 44 U.S.C. § 1505, 5 U.S.C. §§ 552, 553—it never became a binding final rule.  As for OFR's scheduling violation, Defendants argued that Plaintiffs had not adequately pled a violation, but that Plaintiffs lacked an injury in fact regardless.

The district court granted Defendants' motion in full.  Op. 1 (JA__).  The court held that Plaintiffs had standing to assert their APA claims based on USDA's revocation of the Final Rule.  Op. 6-11 (JA__-__).  But the court agreed with Defendants that an agency rule is not "final" until its actual publication in the Federal Register.  Op. 12 (JA__).

The district court acknowledged Plaintiffs' argument that the APA permits enforcement of unpublished regulations against individuals with "actual notice."  Op. 12-13, 17-18 (JA__-__, __-__).  But the court held that this merely amounts to an "exception," which "gives agencies flexibility to enforce rules that all parties admit they knew of even if publication had not yet occurred."  Op. 13-14 (JA__-__).  By contrast, "in a case where the agency does not consider a rule to be finalized," an unpublished rule "does not constitute a finalized, legislative rule."  Op. 12 (JA__) (emphasis added); *see also* Op. 18 (JA__) (distinguishing "[c]ases where the agency

itself chooses to enforce a rule" even without publication). The district court did not address the FRA's language providing that agency documents are "valid" when they are "made available for public inspection." 44 U.S.C. § 1507.

The district court also dismissed the significance of cases holding that a rule has "issued" for purposes of judicial review once it has been approved by the agency and publicized, as well as this Court's precedent deeming a rule "valid" at the point it is filed with the Federal Register. Op. 19-20 (JA__-__). The district court noted that these were "*not* the sort of cases where an agency has backed away from a previously announced course of action." Op. 19 (JA__).

The district court also considered itself bound by this Court's decision in *Kennecott Utah Copper Corp. v. United States Department of the Interior*, 88 F.3d 1191 (D.C. Cir. 1996), which held that an agency could withdraw a rule from publication even after it had submitted the rule to OFR. Op. 14, 21 (JA__, __). The district court acknowledged that in *Kennecott*, unlike here, the agency rule had not yet been made available for public inspection; the rule was still in the middle of OFR's "confidential processing period." Op. 14-15 (JA__). But the district court "s[aw] no reason why a rule's withdrawal during the confidential processing period, as opposed to during the period of public inspection—which still precedes final publication—should be reason enough for a different result." Op. 15 (JA__).

Based on that premise that there was never a final, binding rule, the district court dismissed Plaintiffs' APA claims against the USDA defendants. Op. 21-22 (JA__-__). The district court also held that Plaintiffs could not state a claim based on OFR's violation of its scheduling regulation. Op. 24 (JA__). The court did not dispute that OFR erred by scheduling the Final Rule for publication on January 24. *See id.* Instead, the court found that Plaintiffs lacked standing to assert this claim. *Id.* It reasoned that even if OFR had scheduled the Final Rule for publication on January 23, the new administration still would have had an opportunity to request the rule's withdrawal sometime after President Trump's inauguration. Op. 24-25 (JA__-__). Because Plaintiffs' harm "could have occurred regardless," the court found that Plaintiffs could not show an injury. Op. 24 (JA__) (citation omitted).

## SUMMARY OF ARGUMENT

I. The Horse Protection Act grants USDA the authority to "issue" rules enforcing the Act's mandates. Here, USDA did just that. After a robust round of notice and comment, USDA formally approved the contents of a "final rule" amending the agency's Horse Protection Act regulations; posted the full text of that rule on the agency's website; and then transmitted that rule to OFR, which again made the rule available for public inspection. Because the agency had reached the culmination of its decisionmaking process and conveyed notice of its action through official channels—twice—the Final Rule officially became law and bound the

agency going forward. USDA therefore violated the APA when it withdrew the Final Rule on January 23, 2017 without notice and comment and without a reasoned explanation.

The plain text of the Federal Register Act compels that conclusion. The FRA expressly provides that an agency rule is legally "valid" once it is "made available for public inspection." 44 U.S.C. § 1507. And authoritative Executive Branch interpretations reinforce the text's clear import. In a formal opinion immediately following the FRA's enactment, the Attorney General determined that "publication in the Federal Register is not essential to [agency documents'] validity." *Questions Arising in the National Archives Establishment Under the Federal Register Act*, 38 Op. A.G. 359, 361 (1935). The Office of Legal Counsel of the Department of Justice has also found that "as a matter of law," "promulgation" takes place when agency rules "are officially filed" with OFR to be made available for public inspection, "*regardless of when they are published*." *Federal Register Act—Date of "Promulgation" of Law Enforcement Assistance Administration Regulations*, 1 Op. O.L.C. 12, 12 (1977) (emphasis added).

The district court did not address the language of 44 U.S.C. § 1507. Instead, the court agreed with Defendants that the APA requires Federal Register publication as a condition of a rule's finality. Yet the court acknowledged that the APA—like the FRA—is crystal clear that agencies may enforce substantive rules even if the

statute's publication requirement is violated. The district court's view thus leads to the absurd and self-contradictory conclusion that an unpublished regulation can be both (1) enforced against parties with notice (because it has become law), and (2) withdrawn at the agency's whim (because it has not yet become law). That cannot be right.

The district court also believed that *Kennecott Utah Copper Corp. v. United States Department of the Interior*, 88 F.3d 1191 (D.C. Cir. 1996), directed the outcome here. But that case is readily distinguishable, for reasons the Ninth Circuit has already explained. *See Natural Res. Def. Council, Inc. v. Perry*, 940 F.3d 1072, 1077 (9th Cir. 2019). *Kennecott* merely held that an agency may withdraw a rule from the publication process during OFR's "confidential processing period"—i.e., *before* it is made available to the public. 88 F.3d at 1206. The Court did not decide whether an agency can withdraw the rule after the point of public release. This Court should squarely answer that question now and hold that public release is the point of no return.

II.  Plaintiffs' claim based on OFR's violation of 1 C.F.R. § 17.2 provides an independent basis for relief. Under the clear terms of that mandatory scheduling regulation, OFR was required to publish the Final Rule on January 23, 2017—not January 24. And contrary to the district court's standing analysis, OFR's actions indisputably harmed Plaintiffs. Had the Final Rule been properly scheduled, it

would have been impossible for USDA to request the rule's withdrawal before final publication—and the new regulatory regime would have gone into effect.

For all of these reasons, the district court's judgment should be reversed, and Plaintiffs' claims should be allowed to proceed.

## STANDARD OF REVIEW

The Court reviews the grant of a motion to dismiss de novo. *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1240 (D.C. Cir. 2018). To determine whether Plaintiffs have stated a plausible claim for relief, this Court "must treat the complaint's factual allegations as true, and must grant [Plaintiffs] the benefit of all inferences that can be derived from the facts alleged." *Id.* at 1240-41 (citation omitted).

## ARGUMENT

## I. USDA VIOLATED THE ADMINISTRATIVE PROCEDURE ACT WHEN IT REVOKED THE FINAL RULE

The APA defines a rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). The APA requires agencies to go through notice and comment before promulgating a substantive rule. *Id.* § 553(b). Agencies must also go through notice and comment before repealing or revoking such a rule. *See id.* § 551(5); *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 479 (D.C. Cir. 1982), *aff'd*, 463 U.S. 1216 (1983). In addition, the APA

requires agencies to acknowledge a change in position and provide a reasoned explanation for the change. *See* 5 U.S.C. § 706(2)(A); *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016). If an agency revokes a rule without complying with the APA, a court may set aside the revocation and reinstate the prior rule. *See Consumer Energy Council*, 673 F.2d at 434, 479; *Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 802 (D.C. Cir. 1983) (per curiam).

In this case, the Final Rule was signed by a USDA official on January 11, 2017, posted on the USDA website on January 13, and made available for public inspection on January 19. USDA failed to engage in a new round of notice and comment between that time and the agency's January 23 request for OFR to withdraw the rule from publication. Compl. ¶ 95 (JA__). And at the time of that request, USDA offered no explanation for why it believed the Final Rule was no longer necessary to carry out the Horse Protection Act's mandate to eliminate horse soring. *Id.*; *see also* Final Rule at 4 (JA__).

The fundamental dispute between the parties on appeal is whether USDA "issued" the Final Rule—thereby giving it the status of law—before withdrawing it from publication. That is, the parties disagree about when the Final Rule became a "rule" within the meaning of the APA. As explained below, the Final Rule was issued when its text was made available to the public on January 13, 2017—or at the

latest, when OFR published it for public inspection on January 19, 2017. As a result, the agency's subsequent revocation of that rule was unlawful and must be set aside.

### A. The Final Rule Was Issued When It Was Approved By The Agency And Released To The Public

1. To determine when USDA's rule became binding law, it makes sense to begin with administrative law first principles. Under the *Bennett v. Spear* test, a substantive rule is "final"—and subject to judicial review under the APA—at "'the consummation of the agency's decisionmaking process.'" *Brotherhood of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 99 (D.C. Cir. 2020) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). Specifically, when there is "nothing more for the agency to review or resolve" and it has "approv[ed]" the rule's substance, that action is final. *Id.* at 100.[4]

It also makes sense to look to the source of USDA's authority to create a rule in the first place: the Horse Protection Act. Like many statutory grants of regulatory authority, the Horse Protection Act authorizes the Secretary of Agriculture "to *issue* such rules and regulations as he deems necessary to carry out" the statute's

---

[4] The second *Bennett* prong asks about the kind of action at issue: whether it is one "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" 520 U.S. at 177-78 (citation omitted). There can be no dispute that the Final Rule—a substantive rule under the APA—altered legal obligations and imposed new legal consequences on regulated entities. That rule amended USDA's existing regulations to impose new prohibitions against a wider array of action devices and substances and installed a new regime for training, and licensing, and overseeing enforcement officials. *See supra* at 9-10.

directives.  15 U.S.C. § 1828 (emphasis added).  To "issue" means "[t]o send out or distribute officially," *Black's Law Dictionary* (11th ed. 2019), or "to cause to appear or become available by officially putting forth or distributing or granting or proclaiming or promulgating," *Webster's Third New International Dictionary* (1971).

Putting those two together, it follows that USDA rules implementing the Horse Protection Act become law when, after the completion of the agency's deliberative process, the Secretary (or his delegee) formally approves the final rule and "distributes" the text of that rule to the public through an official channel.

Here, that point was January 13, 2017: the date that USDA posted the full text of the Final Rule on its website with an accompanying bulletin.  By that juncture, the agency had completed notice and comment, the USDA Acting Deputy Under Secretary had approved and signed what the agency deemed a "Final rule," and the rule's contents had been released to the public in full.  Compl. ¶¶ 82-83 (JA__-__); Compl. Ex. A at 1, 149 (JA__, __).  At the very least, however, the Final Rule was duly issued on January 19, 2017—the day that OFR complied with its statutory obligation to make the document available for public inspection.

As discussed below, equating the point of issuance with the point of public release tracks the text of the Federal Register Act, the APA, and longstanding Executive Branch interpretation.  *See infra* at 25-29, 32-26.  It also aligns with this

Court's case law. *See infra* at 36-39, 41-44. And it provides a clear-cut rule for agencies, regulated entities, and courts to follow: Once the agency or OFR makes the rule public, the rule has been issued and the agency is bound.

2. Start with the Federal Register Act. In 1935, Congress enacted the FRA "[t]o provide for the custody of Federal proclamations, orders, regulations, notices, and other documents, and for the prompt and uniform printing and distribution thereof." Pub. L. No. 74-220, 49 Stat. 500, 500 (1935). As amended, the FRA requires categories of agency documents to be published in the Federal Register, including those having "general applicability and legal effect" and "classes of documents that may be required so to be published by an Act of Congress." 44 U.S.C. § 1505(a). The FRA also sets forth the publication process: (1) the agency must transmit the original document and two copies to OFR, where it will be "filed"; (2) "upon filing," OFR must make the document "immediately available for public inspection in the Office"; and (3) OFR must "immediately" send the document to the Government Publishing Office be printed. *Id.* § 1503; *see also id.* § 1504. OFR implementing regulations have also provided for a brief "confidential processing" period after the agency transmits the document but before the document is filed for public inspection. 1 C.F.R. §§ 17.1, 17.2; *see Kennecott Utah Copper Corp. v. U.S. Department of Interior*, 88 F.3d 1191, 1205-06 (D.C. Cir. 1996).

But nothing in the FRA conditions the finality of an agency rule on whether it is published. *See* 44 U.S.C. §§ 1501-09. Instead, the FRA provides that "publication in the Federal Register of a document creates *a rebuttable presumption* . . . that it was duly issued, prescribed, or promulgated." *Id.* § 1507(1) (emphasis added). It sets forth an evidentiary rule: Publication can be used as proof of issuance, but it is not a legal requirement for issuance itself.

And crucially, that same FRA provision explicitly instructs that a document becomes "valid" once it is posted for public inspection:

> A document required by section 1505(a) of this title to be published in the Federal Register is *not valid* as against a person who has not had actual knowledge of it *until* the duplicate originals or certified copies of the document have been filed with the Office of the Federal Register *and a copy made available for public inspection* as provided by section 1503 of this title.

*Id.* § 1507 (emphasis added). "Valid" means "[h]aving legal strength or force; executed with the proper formalities; legally sufficient or efficacious; incapable of being rightly overthrown or set aside." *Webster's New International Dictionary* (1923); *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997) ("[W]ords in a statute are assumed to bear their 'ordinary, contemporary, common meaning.'" (citation omitted)). Thus, the FRA expressly ties the document's "legal force" to the point at which it is made available to the public. And even before public inspection, the document is "valid" as to a "person who has . . . actual knowledge of it." 44

U.S.C. § 1507; *see also United States v. Aarons*, 310 F.2d 341, 346 (2d Cir. 1962).[5]

This reinforces that notice, not final publication, is the lodestar.

So based on the FRA's plain text, an agency document is legally binding at the point of public release—not publication in the Federal Register. Indeed, this has been the Executive Branch's understanding for over three-quarters of a century. The same year as the FRA's enactment, President Franklin D. Roosevelt asked his Attorney General whether documents required to be published must be *actually* published "for such documents to be valid"—or whether it suffices for the agency to file the document with the Division of the Federal Register (OFR's predecessor). *Questions Arising in the National Archives Establishment Under the Federal Register Act*, 38 Op. A.G. 359, 359 (1935). The Attorney General told the President that the answer was "clear": "documents required . . . to be published under section 5 of [the FRA] are . . . valid and operate as constructive notice to the persons designated as soon as they have been filed with the Division and made available for public inspection." *Id.* at 361. Thus, "publication in the Federal Register is not

_____

[5] Other portions of the FRA confirm that final publication is not required for a document to be considered "issued" or "promulgated." The statute defines a "document"—i.e., the item that agencies transmit to OFR to be published—to include a "regulation [or] rule . . . issued, prescribed, or promulgated by a Federal agency"—with the verbs in the past tense. 44 U.S.C. § 1501. Likewise, Section 1503 instructs agencies to transmit to OFR "all such documents issued, prescribed, or promulgated by the agency." *Id.* § 1503. These provisions suggest that an agency "issues" or "promulgates" a rule even before it transmits the rule to OFR.

essential to their validity." *Id.* The Attorney General's contemporaneous understanding of a statute is "persuasive evidence" of its meaning. *United States v. Board of Comm'rs*, 435 U.S. 110, 131 (1978).

Forty years later, the Department of Justice Office of Legal Counsel reaffirmed that position. A statute required the Law Enforcement Assistance Association to "promulgate" regulations within a certain time; the agency asked the Office of Legal Counsel "whether, as a matter of law, 'promulgation' takes place at the time of *publication* in the Federal Register or at the time of *filing* at the Office of the Federal Register." *Federal Register Act—Date of "Promulgation" of Law Enforcement Assistance Administration Regulations*, 1 Op. O.L.C. 12, 12 (1977) (emphasis added). Once again, the Office believed the answer was "clear": "promulgation takes place when documents are officially filed at the Office of the Federal Register regardless of when they are published." *Id.*; *see also id.* ("[F]iling with the Federal Register constitutes promulgation of a regulation even though publication may not occur until a later date."). This followed, the Office of Legal Counsel explained, from the FRA's instruction that filing a document with OFR makes it "immediately available for public inspection"—thereby giving regulated entities "constructive notice" of its contents. *Id.*; *see also* 44 U.S.C. §§ 1503, 1507.

In short, the FRA and these authoritative Executive Branch opinions conclusively support Plaintiffs' position: that the Final Rule "issued" when USDA

posted the rule on its website, or at least by the time that OFR made the rule available for public inspection. *See* Robert Newman, *The Effectiveness of an Unpublished Rule*, 1995 Ann. Surv. Am. L. 1, 5 (1995) (agreeing "that filing [with OFR] and public availability have the significance of binding an agency to a regulation to the same extent that publication would bind the agency").

3. Notably, Plaintiffs' position also directly tracks the stance the government has taken with respect to a *different* agency rule issued this past year. In June 2020, the Department of Health and Human Services (HHS) promulgated a rule revising its regulations implementing Section 1557 of the Affordable Care Act. *See* 85 Fed. Reg. 37,160 (June 19, 2020). Plaintiffs across the country challenged the new rule in litigation; one of the issues was HHS's failure to address the impact of the Supreme Court's nearly contemporaneous decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), which had relevance for HHS's interpretation of Section 1557's nondiscrimination provisions. *See, e.g.*, Compl. ¶¶ 3, 14-15, *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 20-1630-JEB (D.D.C.) (*Whitman-Walker*), Dkt. 1. The timeline was as follows: on June 12, HHS posted the final rule on its website and filed it with the Federal Register; also on June

12, OFR posted the rule for public inspection; on June 15, *Bostock* came down; and on June 19, the rule was published.[6]

During an August 3, 2020 hearing, District Judge Boasberg questioned the government about the rule's failure to address *Bostock*. Counsel for the government responded that "the rule was effectively completed *and released to the public* before *Bostock*," and emphasized that *Bostock* had not been on the books "*as the rule was being issued.*" *Whitman-Walker* Hr'g Tr. 42:10-13, 16-18, Dkt. 46 (emphasis added). Government counsel also represented to the court, in no uncertain terms, that "*the final agency action occurred before Bostock.*" *Id.* at 43:2-4 (emphasis added).

In other words—*one week* after the district court's July 27, 2020 decision in this case—the government told a different D.D.C. judge that once an agency approves a "final rule," posts the rule's text on its website, and OFR makes it available for public inspection, the rule has been "issued" and the agency's action is "final." Plaintiffs fully agree.[7]

---

[6] *See id.* ¶¶ 3, 11, 14, 86; *Whitman-Walker* Hr'g Tr. 42:2-9; Centers for Medicare & Medicaid Services, Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority (2020), https://www.federalregister.gov/d/2020-11758 (hover over icon for "Public Inspection" on left-hand side of the document).

[7] The government made similar representations to another district court in another hearing. *See* Hr'g Tr. 14:18-24, *Washington v. U.S. Dep't of Health &*

## B. Nothing In the APA Conditions A Rule's Validity On Federal Register Publication

In this case, however, Defendants have taken the opposite tack. They argued—and the district court agreed—that an agency regulation "does not become final and binding until the moment it is published in the *Federal Register*." Defs.' MTD 17, Dkt. 18-1; *see also* Op. 21-22 (JA__-__). In their briefing below, Defendants pointed to two sources for that supposed rule: the FRA and the APA.

To be sure, both statutes require substantive rules (like many other agency documents) to be published in the Federal Register for the guidance of the public. But as discussed above, the FRA explicitly instructs that rules are legally operative at the public-inspection stage. *See supra* at 27-29. Far from supporting Defendants' position that publication is an absolute condition of promulgation, the FRA fatally undermines it.

The same is true of the APA. Defendants have relied on Sections 3 and 4 of the statute, 5 U.S.C. §§ 552 and 553. But nothing in the APA contradicts the FRA's instruction that a rule is "valid" upon being made available to the public. And like the FRA, the APA expressly provides that rules are enforceable against individuals

---

*Human Servs.*, No. 20-cv-01105 (W.D. Wash.), Dkt. 69 (explaining that the rule "was posted on HHS's website," "made publicly available," and "sent to the Federal Register's office" on June 12, so "HHS was done with this rule before *Bostock* came out").

with actual notice even if an agency violates the publication requirement. So the APA does not advance Defendants' theory, either.

1. Section 3 of the APA—also known as the Freedom of Information Act (FOIA), after the 1966 law that amended the original APA provision—requires agencies to "make available to the public" certain categories of "information." 5 U.S.C. § 552(a). Some of that information must be "publish[ed] in the Federal Register for the guidance of the public." *Id.* § 552(a)(1). That category includes "substantive rules of general applicability adopted as authorized by law." *Id.* § 552(a)(1)(D).

Nothing in APA Section 3 states that publication is a requirement for a rule's issuance. *See Aarons*, 310 F.2d at 347-48. Instead, Section 3 provides only one sanction for noncompliance: "Except to the extent that a person has actual or timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." 5 U.S.C. § 552(a). The provision's language thus makes plain that substantive rules are enforceable against regulated parties with actual notice *even if the rules are not published*.

Defendants do not deny this. In fact, they *agree* that "there is no question that an agency may enforce a pre-publication rule against those who have actual knowledge of it." Defs.' MTD Reply 14, Dkt. 25 (internal quotation marks omitted).

But that can only be true if the pre-publication rule is final and has become law. After all, an agency cannot enforce a rule that does *not* carry the force of law. Rules are either issued and enforceable, or they are not. The government cannot have it both ways.

Indeed, a memorandum issued by the Attorney General immediately following FOIA's passage—considered "a reliable guide in interpreting" the statute, *FCC v. AT&T Inc.*, 562 U.S. 397, 409 (2011)—confirms that FOIA was not intended to set forth a condition on the validity of substantive rules, but merely to better ensure public *notice* of such rules. Section 3 of the APA had already required the publication of substantive rules, the Attorney General explained, but the FOIA Congress merely wanted to provide "added incentive" for agencies to comply. *Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act* at 210-11 (1967) ("*FOIA Memorandum*") (quoting S. Rep. No. 88-1219, at 12 (1964)); *see also* H.R. Rep. No. 89-1497, at 7 (1966); *infra* note 8. The Attorney General also explained that "actual and timely notice *cures the defect of nonpublication*, and 'a person having actual notice is equally bound' as a person having constructive notice by Federal Register publication." *FOIA Memorandum* at 211 (emphasis added). Moreover, the Attorney General interpreted this "new sanction" to "operate[] only to relieve persons of *obligations* imposed in materials not published, and not to deny them *benefits*." *Id.* (emphasis added). Thus,

according to the Attorney General, an agency's failure to publish a rule benefiting the public has no repercussions whatsoever for the rule's validity, whether the public had notice or not. Yet again, Defendants' position in this case simply cannot be reconciled with this previous Executive Branch understanding.

2. Defendants have also pointed to Section 4 of the APA, 5 U.S.C. § 553, as supposedly requiring Federal Register publication as a condition of validity. Section 4 sets forth the required process for notice-and-comment rulemaking: "General notice of proposed rule making shall be published in the Federal Register," "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," and "[a]fter consideration . . . the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." *Id.* § 553(b), (c). Section 4 also instructs that "[t]he required publication . . . of a substantive rule shall be made not less than 30 days before its effective date," unless an exception to that waiting period applies. *Id.* § 553(d). Defendants have argued that this language in Section 4(d) "creates a presumption that publication in the *Federal Register* is a necessary step for a rule to become effective on the public." Defs.' MTD Reply 10, Dkt. 25.

But Section 4(d)'s reference to "*the* required publication" of a substantive rule is necessarily referring back to the publication requirement in the previous section of the APA, Section 3—not to any unstated publication requirement mandated by

Section 4. "The" is a definite article, signaling that the identity of the noun is already known. *See Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019). Defendants themselves advanced this interpretation below. Defs.' MTD Reply 11, Dkt. 25.[8] So interpreted, Section 4 of the APA does not impose an additional publication mandate; it merely cross-references the operative requirement in Section 3. And Section 3 makes clear that the sanction for noncompliance is that the rule cannot be enforced against parties lacking actual notice—*not* that the rule is not "valid" or "issued" at all. *See supra* at 32-34.

The fact that Section 4(d) requires publication to precede the rule's effective date by 30 days is also not probative. A rule can be issued without yet being "in effect"—i.e., without its provisions being operative. Congressional statutes often set future effective dates for various provisions, but no one would say that a bill that has passed both houses and been signed by the President is not an "Act of Congress" until the effective date has passed. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538, 540 (2012) (stating that "[i]n 2010, Congress enacted the Patient Protection and Affordable Care Act" and referring to "the day the President signed the Act into law," even though the provisions under review did not go into effect

---

[8]     As originally enacted in 1946, the APA contained both the language in Section 3 requiring publication of "substantive rules" and the language in Section 4 referring to "the required publication" of "substantive rule[s]." Pub. L. No. 79-104, §§ 3(a)(3), 4(c), 60 Stat. 237, 238-39 (1946).

until later). That is why this Court has treated an agency's indefinite stay of a regulation's effective date as a de facto *repeal* of that rule. *See, e.g.*, *Clean Air Council v. Pruitt*, 862 F.3d 1, 6-7 (D.C. Cir. 2017) (per curiam). Perhaps for this same reason, the 1977 Office of Legal Counsel opinion—which was written after the APA's enactment, and which concerned substantive rules—had no problem concluding that "promulgation" occurs "as a matter of law" before final publication. 1 Op. O.L.C. at 12.

### C. Precedent Confirms That USDA Issued The Final Rule Before Withdrawing It

Cases from this Court and elsewhere confirm that Federal Register publication is not required for an agency rule to be valid and enforceable. These cases, along with decisions determining the point of a rule's "issuance" in analogous contexts, support treating an agency rule as final and binding on the agency once it is made available to the public.

1. Consistent with the text of the FRA and the APA, courts have held that unpublished agency orders and rules are fully enforceable against persons with actual notice of them. *See, e.g.*, *Kessler v. FCC*, 326 F.2d 673, 689-90 (D.C. Cir. 1963) (holding that an unpublished order was effective against parties with actual notice on May 14, 1962, when the order was adopted May 10 but not published in the Federal Register until May 16); *Aarons*, 310 F.2d at 345-48 (holding that unpublished Coast Guard order was effective against parties who had received a

copy of the order); *United States v. Mowat*, 582 F.2d 1194, 1199-203 (9th Cir. 1978) (holding that a violation of the APA's publication requirement does not affect persons who have "actual and timely notice" of the substantive rule, even in a criminal prosecution); *United States v. Floyd*, 477 F.2d 217, 222 (10th Cir. 1973) (rejecting criminal defendants' argument that regulation was "not promulgated in compliance with" the FRA and the APA, as those are "in effect, 'notice' statutes intended to protect persons who have no *actual notice*"); *Tearney v. Nat'l Transp. Safety Bd.*, 868 F.2d 1451, 1454 (5th Cir. 1989) ("[P]ersons with actual notice of a rule, even though unpublished, are held accountable"). Again, Defendants agree that a violation of the Federal Register publication requirement is no barrier to enforcement in such circumstances. *See supra* at 33.

2. This Court has also found, in a variety of contexts, that an agency has issued a legally operative rule before the point of Federal Register publication. In *Saturn Airways, Inc. v. Civil Aeronautics Board*, the Court had to decide when Civil Aeronautics Board regulations had been "issu[ed]" within the meaning of 28 U.S.C. § 2112, to determine whether airline carriers' petitions for judicial review was premature. 476 F.2d 907, 909 (D.C. Cir. 1973) (per curiam). By the time the relevant challengers filed their petitions, the Board had "adopted" the regulations and issued a detailed press release describing them, but had not yet published their text in the Federal Register. *Id.* at 908-09. The *Saturn Airways* Court rejected the

argument that the petitions were premature because they "preceded the issuance" of the regulations.  *Id.* at 909.  At the time of the petitions' filing, the Court explained, "it was clear both that the Board had taken *what it deemed official action* and that the substance of that action *had been communicated to the public* in some detail." *Id*. (emphasis added).

Similarly, in *American Petroleum Institute v. Costle*, this Court was asked to pinpoint a rule's "date of . . . promulgation" for purposes of deciding when the rule's administrative record was closed.  609 F.2d 20, 23 (D.C. Cir. 1979).  *Costle* held that the promulgation date is "the date that the rule is signed and released to the public."  *Id.* at 24.  "At that time," the Court explained, "the agency's decision is fixed, and no additional data or arguments will change it."  *Id.*  And the Court specifically rejected the government's argument that the date of Federal Register publication made more sense.  *Id.*

In *National Association of Manufacturers v. NLRB* ("*NAM*"), this Court once again deemed the agency's rulemaking process complete at the point of the rule's public release.  717 F.3d 947 (D.C. Cir. 2013), *overruled in part on other grounds by Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) (en banc). There, the Court held that an NLRB rule was "valid[]" once the Board "filed" it with the Federal Register to be made "available for public inspection."  *Id.* at 953-54; *see also id.* at 953 (relying on the Office of Legal Counsel opinion).  It therefore did not

matter that the Board had lost a quorum—and the ability to issue rules carrying the force of law—by the time OFR actually published the rule. "Once the rule was filed with the Office of the Federal Register, the Board had taken all the steps necessary to issue the rule—there was nothing left for the Board to do. All that remained was for the rule to be published in the Federal Register, but that was in the hands of the Office of the Federal Register." *Id.* at 953. So too here.

3. Case law from other circuits also supports Plaintiffs' position. The Fifth Circuit has squarely held that a USDA rule is validly promulgated even when it has not been published in the Federal Register, so long as the rule is released to the public. *See Arlington Oil Mills, Inc. v. Knebel*, 543 F.2d 1092 (5th Cir. 1976). In *Arlington Mills*, USDA had issued a March 19, 1976 press release, after notice and comment, announcing an upward adjustment in price support for Virginia peanuts. *Id.* at 1096. But on July 6, 1976, USDA issued another press release revoking that upward adjustment—without engaging in further notice and comment. *Id.* at 1097. The Fifth Circuit held that even though the March 19 adjustment was never published in the Federal Register as required, the press release constituted a rulemaking because USDA "had made a determination" that was "'final and conclusive'" and the regulated entities "knew" about the announcement. *Id*. at 1099-100 (citation omitted). "The lack of formal publication," the Fifth Circuit explained, "does not preclude the effectiveness of an otherwise valid agency action." *Id.* at

1099.  Accordingly, the Fifth Circuit held that USDA's July 6 press release was a procedurally improper revocation of a duly promulgated rule.  *Id.* at 1099-100.

The Ninth Circuit has also indicated that a regulation becomes binding on the agency once it has been publicly released.  In *Natural Resources Defense Council, Inc. v. Perry*, the Secretary of Energy had approved new energy-conservation standards and the Department of Energy posted those final rules on its website.  940 F.3d 1072, 1076 (9th Cir. 2019).  Following a change in administration, the Department failed to submit the standards to OFR for publication, in violation of the timeline set forth in a Department of Energy procedural rule.  *Id.*  The Ninth Circuit noted the parties' agreement that "ordinarily, agencies are free to withdraw a proposed rule before it has been published in the Federal Register, even if the rule has received final agency approval."  *Id.* at 1077 (citing this Court's decision in *Kennecott*).  But the Ninth Circuit emphasized that the conservation standards were "made available for public inspection [i.e., on the Department website] with the expectation that they would become final"—strongly implying that they could not be withdrawn at that point.  *Id.*  The *Perry* court had no need to definitively decide the issue, however, because the Department's violation of its procedural rule provided an alternative ground for the court to order publication of the conservation standards.  *Id.* at 1077-80.

In short, these cases consistently adopt the reasoning that Plaintiffs put forth here: that agency action is final once the agency has reached the conclusion of its decisionmaking process and issued its determination to the public. And they consistently reject Defendants' argument: that Federal Register publication is required for a rule to carry the force of law.

## D. The District Court's Analysis Was Wrong

The district court reached its contrary conclusion—that Federal Register publication is a necessary predicate for a rule to issue—based on unpersuasive and inconsistent reasoning.

1. The district court believed that this Court's decision in *Kennecott* "control[led]" the outcome here. Op. 21 (JA__). But that case is readily distinguishable. In *Kennecott*, the Interior Department had approved a set of regulations under President George H.W. Bush and sent the document to OFR for publication. 88 F.3d at 1200. But then President Bill Clinton took office, and in the middle of OFR's "confidential processing period"—but "*before* the OFR filed the document for public inspection"—his administration withdrew the document. *Id.* at 1200-01, 1206 (emphasis added).

The *Kennecott* Court's analysis focused on whether OFR's regulation establishing the confidential processing period, and its policy of allowing agencies to withdraw rules during that period, warranted *Chevron* deference as a reasonable

42

interpretation of the FRA's requirement that documents be "immediately" filed for public inspection and published. *Id.* at 1205-06. The Court concluded that deference was appropriate. *Id.* at 1206. It reasoned that "[a]llowing agencies to withdraw documents during the relatively brief processing period is consistent with the [FRA's] purpose—establishing an orderly process for filing and publishing government regulations." *Id.* And having found that Interior's withdrawal of the document was permissible, the *Kennecott* Court readily reached the further conclusion that the document "never became a rule subject to amendment or repeal." *Id.* at 1209.

Nothing in the *Kennecott* opinion or briefing indicates that Interior had ever publicized the text of the rule before its withdrawal. *See id.* at 1200-01, 1205-06. If Interior had already provided public notice of the rule's contents before transmitting it to the Federal Register, then *Kennecott* was not correctly decided. *See supra* at 23-25.

But in any event, it is clear that the rule in *Kennecott* had not yet reached the stage of public inspection. And this fact was central to *Kennecott*'s analysis about why Interior's withdrawal of the document was permissible. The Court emphasized that the withdrawal was "well within" the "confidential processing period," noted that OFR permits agencies to withdraw documents "at any time *before* the OFR ma[kes] the document available for public inspection," and reasoned that

"[a]llowing agencies to withdraw documents *during the relatively brief processing period* is consistent with the statute's purpose." *Id.* at 1205-06 (emphasis added).

Nor are Plaintiffs alone in reading *Kennecott* this way. In *Perry*, the Ninth Circuit interpreted *Kennecott* as holding "that an agency could withdraw regulations that were submitted to the Office of the Federal Register at any time *up until* the regulations were made available for public inspection." 940 F.3d at 1077 (emphasis added). Reinforcing the point, the Ninth Circuit noted that "the regulations at issue in *Kennecott* were never made available for public inspection with the expectation that they would become final." *Id.* And the Ninth Circuit suggested that withdrawal would be inappropriate under those circumstances. *See id.*

Here, the district court nonetheless saw "no reason why a rule's withdrawal during the confidential processing period, as opposed to during the period of public inspection—which still precedes final publication—should be reason enough for a different result." Op. 15 (JA__). But there are good reasons to draw that distinction. First, the FRA explicitly states that once a document has been filed for public inspection, it is "valid" and provides constructive notice as a matter of law. 44 U.S.C. § 1507; *see supra* at 27. Second, the Attorney General and the Office of Legal Counsel have long taken the position that public release is the crucial juncture. *See* 38 Op. A.G. at 361; 1 Op. O.L.C. at 12; *supra* at 28-29. Third, the APA instructs that notice determines whether a regulation is enforceable. 5 U.S.C. § 552(a); *supra*

at 32-33. And fourth, the *Kennecott* Court indicated that withdrawal was permissible *because* the document was still being "confidential[ly]" processed and had not yet reached "public release"—implying that the latter was the point of no return. 88 F.3d at 1206; *see also id.* (deciding "whether the OFR may confidentially process a document *prior to making it available to the public* and allow an agency to withdraw a document during this period" (emphasis added)); *id.* (referring to OFR's "authority to return documents to the issuing agency *before they are made public*" (emphasis added)).

2. Perhaps because it considered *Kennecott* dispositive, the district court also struggled to distinguish the lines of authority supporting Plaintiffs. The court acknowledged the many cases establishing that agencies are permitted to enforce rules even in the absence of Federal Register publication. Op. 13, 17-18 (JA__, __-__). But rather than drawing the natural inference—that publication must not be a prerequisite for rules to be final and binding—the court decided that those decisions must reflect some kind of "exception." Op. 13 (JA__). In such "cases of pre-publication enforcement," the court observed, "the *agency* continues to treat the unpublished rule as final." *Id.* By contrast, the court reasoned, "where the agency does not consider a rule to be finalized, *and* the rule has not been published in the Federal Register, it does not constitute a finalized, legislative rule." Op. 12 (JA__) (emphasis added).

In other words, the district court believed that publication is a requirement for a rule to issue—except when it's not. And the determinative factor, in the court's view, is whether the agency "intend[s] for [the rule] to be final," Op. 21 (JA__), or "chooses to enforce" it, Op. 18 (JA__), at some undefined point in time. *See also* Op. 19-20 (JA__-__) (distinguishing *Saturn Airways* and *NAM* as "*not* the sort of cases where an agency has backed away from a previously announced course of action").

That makes no sense. Again, a rule has either issued or it has not—there is no middle ground. And whether a rule was validly issued at Time 1 cannot depend on whether the agency later decides to back away from it at Time 2. The district court's test would allow agencies to toggle a regulation's validity on and off based on changes in the agency's subjective intent. It is an obvious recipe for regulatory uncertainty and agency overreach. *Cf. Merck & Co. v. U.S. Dep't of Health & Human Servs.*, 962 F.3d 531, 541 (D.C. Cir. 2020) (rejecting conception of agency authority that would allow it to "move the goalposts to wherever [it] kicks the ball").

3. The district court also relied on *Chen v. INS*, 95 F.3d 801 (9th Cir. 1996), to reach its result. Op. 15-16, 21 (JA__-__, __). In *Chen*, President Bush's Attorney General had signed a final rule mandating that immigrants who feared forced sterilization or abortion be eligible for asylum; the rule stated that it would take effect on the date of Federal Register publication. 95 F.3d at 804. But the Clinton

Administration withdrew the rule before publication. *Id.* The Ninth Circuit concluded that because "this rule was to become effective only on the date of publication in the Federal Register," which never occurred, "it has no legal effect and is not binding on this court." *Id.* at 805. The Second Circuit reached essentially the same conclusion about the same immigration rule in *Zhang v. Slattery*, 55 F.3d 732 (2d Cir. 1995). Although the Second Circuit recognized that rules can be valid and enforceable even in the absence of publication (citing Section 3 of the APA), the court reasoned that in this instance, the immigration rule was never "effective" "[b]y its own terms." 55 F.3d at 749.

As noted above, however, the question whether a regulation's provisions are "operative" or "effective" is distinct from whether the regulation has validly issued and carries the force of law, such that it binds the agency going forward. *See supra* at 36. Precedent holding that agencies cannot delay a rule's effective date without notice and comment reflects that distinction. *See Clean Air Council*, 862 F.3d at 6; *Env't Def. Fund, Inc. v. Gorsuch*, 713 F.2d 802, 815-16 (D.C. Cir. 1983); *Council of the S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 580 & n.28 (D.C. Cir. 1981) (per curiam).[9]

---

[9] Although *Kennecott* clarified this rule—holding that it does not apply when there has never been a "duly promulgated regulation[]," 88 F.3d at 1207—here, Plaintiffs maintain there *was* a duly promulgated regulation.

In any case, neither *Chen* nor *Zhang* considered (1) whether the rules had been made available to the public, (2) the language of the FRA, or (3) the on-point Attorney General and Office of Legal Counsel opinions. And the district court's overreading of *Chen* is further undercut by the Ninth Circuit's much more recent suggestion in *Perry* that agencies cannot withdraw regulations that have been "made available for public inspection with the expectation that they would become final." 940 F.3d at 1077. To the extent *Chen* and *Zhang* bear on the issue here, this Court should reject their analysis.

\*       \*       \*

Plaintiffs have provided a straightforward standard consistent with the text of the relevant statutes and this Court's precedent: A final rule has "issued" once the agency has approved the rule and made it available to the public. That unquestionably occurred here—rendering USDA's subsequent withdrawal of the rule unlawful under the APA. The district court's decision must be reversed, and Plaintiffs' APA claims should be allowed to proceed.

## II. THE OFFICE OF THE FEDERAL REGISTER ACTED UNLAWFULLY IN ALLOWING USDA TO WITHDRAW THE FINAL RULE FROM PUBLICATION

Even if the Court were to hold that the Final Rule was not duly issued, however, another one of Plaintiffs' claims should still move forward. *See* Compl. ¶¶ 120-21 (JA__-__). An agency cannot violate its own regulations. *Nat'l Env't*

*Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014).  Here,

OFR violated 1 C.F.R. § 17.2 by scheduling the Final Rule for publication on

Tuesday, January 24 instead of Monday, January 23.  And as a direct result of that

violation, OFR allowed USDA to withdraw the Final Rule from publication.  Had

OFR followed the proper procedures, that withdrawal would have been impossible.

OFR's action complying with USDA's withdrawal request is therefore invalid and

must be vacated.  *See Nat'l Env't Dev.*, 752 F.3d at 1009; 5 U.S.C. § 706(2)(A);

Compl. ¶ 121 & at 45 (JA__, __).

 1.  Again, the FRA requires OFR to "immediately" post agency documents

for public inspection and then "immediately" publish them in the Federal Register.

44 U.S.C. § 1503.  An OFR regulation, 1 C.F.R. § 17.2, implements this directive

by establishing a mandatory schedule for processing and publishing agency

documents.  Section 17.2 provides that a document submitted to OFR before 2:00

p.m. "shall" be assigned to the "regular schedule."  1 C.F.R. § 17.2(b).  Under that

mandatory schedule, OFR must post the document for available public inspection

two business days after its submission, and then publish the document in the Federal

Register the next business day after that; if the agency submits the document to OFR

after 2:00 p.m., it will be treated as having been received the following day.  *Id.*  The

following chart in Section 17.2 illustrates the regular schedule:

| Received before 2:00 p.m. | Filed for public inspection | Published |
|---|---|---|
| Monday ................. | Wednesday ........... | Thursday |
| Tuesday ................. | Thursday ............... | Friday |
| Wednesday ........... | Friday ................... | Monday |
| Thursday ............... | Monday ................. | Tuesday |
| Friday ..................... | Tuesday ................. | Wednesday |

*Id.* § 17.2(c).  Where a federal holiday intervenes, one additional work day is added.  *Id*.

Here, USDA submitted the Final Rule to OFR on or around Monday, January 16, 2017.  Compl. ¶ 93 (JA__).  Even assuming USDA submitted the Rule after 2:00 p.m. on Monday, it should have been posted for public inspection on Thursday, January 19—which it was.  *Id.*  And because Friday, January 20 (Inauguration Day) was a federal holiday in Washington, D.C., Section 17.2 required publication of the Final Rule on Monday, January 23.

OFR did not comply with Section 17.2, however.  Instead of publishing the Final Rule on January 23, OFR inexplicably pushed the date of final publication back by a day—assigning a publication day of Tuesday, January 24.  Compl. ¶ 93 (JA__-__).  That was impermissible:  OFR was not free to disregard the regulation's instruction that rules "shall" be published according to the regular schedule.  1 C.F.R. § 17.2(b); *see also Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,

523 U.S. 26, 35 (1998) ("shall" is "mandatory" and "normally creates an obligation impervious to . . . discretion").[10]

2. The district court did not appear to disagree with any of that. *See* Op. 24-25 (JA__-__). Instead, it ruled that *even if* OFR violated the regulation, Plaintiffs lacked Article III standing to assert a claim on that basis. *Id.* The court reasoned that even if OFR had followed the correct schedule, the Trump Administration would still have been able to withdraw the rule sometime between January 20 and January 23. *Id.* It therefore concluded that Plaintiffs did not have an injury caused by the violation. *Id.*

That was wrong. Had OFR scheduled the Final Rule for publication on January 23 as required, OFR rules and the Regulatory Freeze Memo itself would have prevented USDA from withdrawing the Final Rule. It follows that Plaintiffs' injuries—their harms stemming from the rule's revocation—directly flowed from OFR's actions.

---

[10]   The only exceptions to the mandatory schedule are when "the issuing agency makes special arrangements otherwise, or the Office determines that the document requires a deferred schedule." 1 C.F.R. § 17.2(b). There is no reason to presume that USDA asked for a delayed publication date. Nor is there any basis to infer that OFR placed the Final Rule on the deferred schedule. *See id.* § 17.7(a)(1) (allowing OFR to assign a document to the deferred schedule when there are "technical problems, unusual or lengthy tables, or illustrations, or the document is of such size as to require extraordinary processing time"). OFR processed and then posted the document for public inspection on the correct date (January 19), so the delayed publication date was not due to the document requiring extra processing time.

OFR allows agencies to withdraw "[a] document that has been filed for public inspection . . . but not yet published" so long as the agency submits "a timely letter." 1 C.F.R. § 18.13(a); Office of the Federal Register, *Federal Register Document Drafting Handbook* 4-2 (Oct. 1998 rev.), https://open.defense.gov/Portals/23/Documents/Regulatory/ddh.pdf ("If we have filed the document for public inspection, your Liaison Officer may withdraw it from publication only by submitting a letter requesting the withdrawal."). To be timely, "[t]he letter must reach the OFR during regular office hours (8:45 a.m. to 5:15 p.m. ET) **before noon** on the workday **before** the document's scheduled publication date." *Id.*

Had OFR scheduled the Final Rule for publication on January 23, USDA would have had to submit its withdrawal letter before noon on January 19—the last workday before publication. Even assuming that Inauguration Day counted as a workday, USDA would have been required to submit its letter before noon on January 20. But the Trump Administration issued the Regulatory Freeze Memorandum *after* noon on January 20, after President Trump was inaugurated. *See* U.S. Const. amend. XX, § 1. And although the Regulatory Freeze Memorandum directed the withdrawal of not-yet-published rules, it specifically instructed that any such withdrawal "must be conducted consistent with OFR procedures." 82 Fed. Reg. at 8346. Thus, if OFR had adhered to the proper schedule, USDA would not

have been directed (or even permitted) to request the rule's withdrawal. And OFR could not have lawfully honored the request.

Contrary to the district court's analysis, it would have been impossible for USDA to obtain the Final Rule's withdrawal after President Trump took office had OFR adhered to the mandated schedule. As a direct result of OFR's violation of 1 C.F.R. § 17.2, OFR improperly allowed USDA to withdraw the Final Rule from publication—causing Plaintiffs' injury. The withdrawal must be set aside and OFR must publish the Final Rule in accordance with its regulations and 44 U.S.C. § 1503.

## CONCLUSION

The district court's judgment should be reversed and the case remanded for further proceedings.

Date: August 27, 2021

Respectfully submitted,

*/s/ Caroline A. Flynn*

Kimberly D. Ockene
Ralph E. Henry
THE HUMANE SOCIETY OF THE
UNITED STATES
1255 23rd Street, NW
Washington, DC 20037
(202) 285-1388
kockene@humanesociety.org

Caroline A. Flynn
L. Allison Herzog
Roman Martinez
Julia A. Hatcher
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
caroline.flynn@lw.com

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1.      This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,749 words, as determined by the word-count function of Microsoft Word 2016.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman Font.

*/s/ Caroline A. Flynn*
Caroline A. Flynn

**ADDENDUM**

**Pursuant to D.C. Cir. R. 28(a)(5)**

# TABLE OF CONTENTS

**Description**                                                                                    **Page**

5 U.S.C. § 552(a)(1) ............................................................. Add-1

5 U.S.C. § 553 ...................................................................... Add-2

44 U.S.C. § 1503 .................................................................. Add-4

44 U.S.C. § 1505 .................................................................. Add-5

44 U.S.C. § 1507 .................................................................. Add-7

1 C.F.R. § 17.1 ..................................................................... Add-8

1 C.F.R. § 17.2 ..................................................................... Add-9

## § 552.  Public information; agency rules, opinions, orders, records, and proceedings

(a) Each agency shall make available to the public information as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published.  For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

\* \* \*

## § 553.  Rule making

(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

(1) a military or foreign affairs function of the United States; or

(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law.  The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation.  After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.  When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

(2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

## § 1505.  Filing documents with Office; notation of time; public inspection; transmission for printing

The original and two duplicate originals or certified copies of a document required or authorized to be published by section 1505 of this title shall be filed with the Office of the Federal Register, which shall be open for that purpose during all hours of the working days when the National Archives Building is open for official business.  The Archivist of the United States shall cause to be noted on the original and duplicate originals or certified copies of each document the day and hour of filing.  When the original is issued, prescribed, or promulgated outside the District of Columbia, and certified copies are filed before the filing of the original, the notation shall be of the day and hour of filing of the certified copies.  Upon filing, at least one copy shall be immediately available for public inspection in the Office.  The original shall be retained by the National Archives and Records Administration and shall be available for inspection under regulations prescribed by the Archivist, unless such original is disposed of in accordance with disposal schedules submitted by the Administrative Committee of the Federal Register and authorized by the Archivist pursuant to regulations issued under chapter 33 of this title; however, originals of proclamations of the President and Executive orders shall be permanently retained by the Administration as part of the National Archives of the United States.  The Office shall transmit immediately to the Government Publishing Office for printing, as provided by this chapter, one duplicate original or certified copy of each document required or authorized to be published by section 1505 of this title.  Every Federal agency shall cause to be transmitted for filing the original and the duplicate originals or certified copies of all such documents issued, prescribed, or promulgated by the agency.

## § 1505. Documents to be published in Federal Register

(a) PROCLAMATIONS AND EXECUTIVE ORDERS; DOCUMENTS HAVING GENERAL APPLICABILITY AND LEGAL EFFECT; DOCUMENTS REQUIRED TO BE PUBLISHED BY CONGRESS.  There shall be published in the Federal Register—

(1) Presidential proclamations and Executive orders, except those not having general applicability and legal effect or effective only against Federal agencies or persons in their capacity as officers, agents, or employees thereof;

(2) documents or classes of documents that the President may determine from time to time have general applicability and legal effect; and

(3) documents or classes of documents that may be required so to be published by Act of Congress.

For the purposes of this chapter every document or order which prescribes a penalty has general applicability and legal effect.

(b) DOCUMENTS AUTHORIZED TO BE PUBLISHED BY REGULATIONS; COMMENTS AND NEWS ITEMS EXCLUDED.  In addition to the foregoing there shall also be published in the Federal Register other documents or classes of documents authorized to be published by regulations prescribed under this chapter with the approval of the President, but comments or news items of any character may not be published in the Federal Register.

(c) SUSPENSION OF REQUIREMENTS FOR FILING OF DOCUMENTS; ALTERNATE SYSTEMS FOR PROMULGATING, FILING, OR PUBLISHING DOCUMENTS; PRESERVATION OF ORIGINALS.  In the event of an attack or threatened attack upon the continental United States and a determination by the President that as a result of an attack or threatened attack—

(1) publication of the Federal Register or filing of documents with the Office of the Federal Register is impracticable, or

(2) under existing conditions publication in the Federal Register would not serve to give appropriate notice to the public of the contents of documents, the President may, without regard to any other provision of law, suspend all or part of the requirements of law or regulation for filing with the Office or publication in the Federal Register of documents or classes of documents.

The suspensions shall remain in effect until revoked by the President, or by concurrent resolution of the Congress.  The President shall establish alternate systems for promulgating, filing, or publishing documents or classes of documents affected by such suspensions, including requirements relating to their effectiveness or validity, that may be considered under the then existing circumstances practicable to provide public notice of the issuance and of the contents of the documents.  The

alternate systems may, without limitation, provide for the use of regional or specialized publications or depositories for documents, or of the press, the radio, or similar mediums of general communication. Compliance with alternate systems of filing or publication shall have the same effect as filing with the Office or publication in the Federal Register under this chapter or other law or regulation. With respect to documents promulgated under alternate systems, each agency shall preserve the original and two duplicate originals or two certified copies for filing with the Office when the President determines that it is practicable.

## § 1507.  Filing document as constructive notice; publication in Federal Register as presumption of validity; judicial notice; citation

A document required by section 1505(a) of this title to be published in the Federal Register is not valid as against a person who has not had actual knowledge of it until the duplicate originals or certified copies of the document have been filed with the Office of the Federal Register and a copy made available for public inspection as provided by section 1503 of this title.  Unless otherwise specifically provided by statute, filing of a document, required or authorized to be published by section 1505 of this title, except in cases where notice by publication is insufficient in law, is sufficient to give notice of the contents of the document to a person subject to or affected by it.  The publication in the Federal Register of a document creates a rebuttable presumption—

(1) that it was duly issued, prescribed, or promulgated;

(2) that it was filed with the Office of the Federal Register and made available for public inspection at the day and hour stated in the printed notation;

(3) that the copy contained in the Federal Register is a true copy of the original; and

(4) that all requirements of this chapter and the regulations prescribed under it relative to the document have been complied with.

The contents of the Federal Register shall be judicially noticed and without prejudice to any other mode of citation, may be cited by volume and page number.

# 1 C.F.R. § 17.1

## § 17.1. Receipt and processing

Unless special arrangements are made with the Director of the Federal Register, the Office of the Federal Register receives documents only during official working hours. Upon receipt, each document shall be held for confidential processing until it is filed for public inspection.

## § 17.2.  Procedure and timing for regular schedule

(a) Each document received shall be filed for public inspection only after it has been received, processed and assigned a publication date.

(b) Except as provided in paragraph (d) of this section, each document received by 2:00 p.m. which meets the requirements of this chapter shall be assigned to the regular schedule.  Unless the issuing agency makes special arrangements otherwise, or the Office determines that the document requires a deferred schedule (see 1 CFR 17.7), receipt of a document by 2:00 p.m. is considered to be a request for filing for public inspection and publication on the regular schedule.  Documents received after 2:00 p.m. which meet the requirements of this chapter shall be assigned to the next working day's regular schedule.

(c) The regular schedule for filing for public inspection and publication is as follows:

| Received before 2:00 p.m. | Filed for public inspection | Published |
|---|---|---|
| Monday ................. | Wednesday ........... | Thursday |
| Tuesday ................ | Thursday .............. | Friday |
| Wednesday .......... | Friday .................... | Monday |
| Thursday ............... | Monday ................. | Tuesday |
| Friday ..................... | Tuesday ................ | Wednesday |

Where a legal Federal holiday intervenes, one additional work day is added.

(d) Each notice of meeting issued under the "Government in the Sunshine Act" (5 U.S.C. 552b(e)(3)) is placed on immediate public inspection after it has been received, processed, and assigned a publication date.

(1) Each notice received before 4:00 p.m. is scheduled to be published 2 working days later.

(2) Each notice received after 4:00 p.m. is scheduled to be published 3 working days later.