# United States Court of Appeals
# for the District of Columbia Circuit

HUMANE SOCIETY OF THE UNITED STATES; HUMANE SOCIETY LEGISLATIVE FUND; PAULINE STOTSENBERG; JANA BABUSZCZAK; WILLIAM COON; KRISTI QUAINTANCE,
*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE; ANIMAL AND PLANT HEALTH INSPECTION SERVICE; OFFICE OF THE FEDERAL REGISTER; THOMAS J. VILSACK, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE UNITED STATES DEPARTMENT OF AGRICULTURE; KEVIN SHEA, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE ANIMAL AND PLANT HEALTH INSPECTION SERVICE; OLIVER POTTS, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE OFFICE OF THE FEDERAL REGISTER,
*Defendants-Appellees.*

On Appeal from the United States District Court for the District of Columbia
No: 1:19-cv-02458-ESH

**PAGE PROOF REPLY BRIEF OF APPELLANTS HUMANE SOCIETY OF THE UNITED STATES; HUMANE SOCIETY LEGISLATIVE FUND; PAULINE STOTSENBERG; JANA BABUSZCZAK; WILLIAM COON; and KRISTI QUAINTANCE**

Kimberly D. Ockene
Ralph E. Henry
THE HUMANE SOCIETY OF THE
UNITED STATES
1255 23rd Street, NW
Washington, DC 20037
(202) 285-1388
kockene@humanesociety.org

February 11, 2022

Caroline A. Flynn
L. Allison Herzog
Roman Martinez
Julia A. Hatcher
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
caroline.flynn@lw.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... ii

GLOSSARY.............................................................................................. ii

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

ARGUMENT ............................................................................................ 2

I.     USDA VIOLATED THE ADMINISTRATIVE PROCEDURE ACT ........... 2

     A.     Plaintiffs Have Standing........................................................... 2

     B.     USDA Violated The APA By Revoking The Final Rule...................... 8

II.    THE OFFICE OF THE FEDERAL REGISTER UNLAWFULLY DELAYED THE FINAL RULE'S PUBLICATION ................................... 22

     A.     Plaintiffs Have Standing......................................................... 22

     B.     Plaintiffs Are Within The Zone Of Interests Protected By The Federal Register Act............................................................. 23

     C.     OFR Unlawfully Delayed Publication Of The Final Rule................. 24

CONCLUSION ........................................................................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Petroleum Institute v. Costle*,
   609 F.2d 20 (D.C. Cir. 1979) ..............................................................18

\**Arlington Oil Mills, Inc. v. Knebel*,
   543 F.2d 1092 (5th Cir. 1976) ...........................................................16

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) ................................................................8

*Brotherhood of Locomotive Engineers & Trainmen v. Federal
   Railroad Administration*,
   972 F.3d 83 (D.C. Cir. 2020) ................................................................8

*Chamber of Commerce of the United States v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ..............................................................5

*Chen v. INS*,
   95 F.3d 801 (9th Cir. 1996) ................................................................19

*Coeur Alaska, Inc. v. Southeast Alaska Conservation Council*,
   557 U.S. 261 (2009) ............................................................................15

*Comcast Corp. v. FCC*,
   579 F.3d 1 (D.C. Cir. 2009) ..................................................................3

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ............................................................................21

*Defenders of Wildlife v. Gutierrez*,
   532 F.3d 913 (D.C. Cir. 2008) ..............................................................7

\**Department of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ..........................................................................8

\* Authorities upon which appellants chiefly rely are marked with asterisks.

ii

*Department of Homeland Security v. Regents of the University of California,*
140 S. Ct. 1891 (2020) .................................................................... 14,

*East Bay Sanctuary Covenant v. Trump,*
932 F.3d 742 (9th Cir. 2018) .............................................................. 5

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016) ......................................................................... 3

*Florida Audubon Society v. Bentsen,*
94 F.3d 658 (D.C. Cir. 1996) ............................................................ 6

*Hawkins v. Haaland,*
991 F.3d 216 (D.C. Cir. 2021), *petition for cert. filed* (U.S. Oct. 5, 2021) ......................................................................................... 4

*Horsehead Resource Development Co. v. EPA,*
130 F.3d 1090 (D.C. Cir. 1997) ....................................................... 17

*Kennecott Utah Copper Corp. v. United States Department of the Interior,*
88 F.3d 1191 (D.C. Cir. 1996) ............................. 18, 19, 20, 23, 24, 26

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
523 U.S. 26 (1998) ......................................................................... 25

*Maine Community Health Options v. United States,*
140 S. Ct. 1308 (2020) .................................................................... 25

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
567 U.S. 209 (2012) ....................................................................... 23

*Medellín v. Texas,*
552 U.S. 491 (2008) ....................................................................... 21

*Milice v. Consumer Product Safety Commission,*
2 F.4th 994 (D.C. Cir. 2021) ........................................................... 17

*Morton v. Ruiz,*
415 U.S. 199 (1974) ....................................................................... 20

*National Association of Manufacturers v. NLRB,
    717 F.3d 947 (D.C. Cir. 2013)....................................................11, 12, 16, 17, 18

National Grain & Feed Association v. OSHA,
    845 F.2d 345 (D.C. Cir. 1988)..........................................................................17

National Organization of Veterans' Advocates, Inc. v. Secretary of
    Veterans Affairs,
    981 F.3d 1360 (Fed. Cir. 2020) ..................................................................14, 15

*Natural Resources Defense Council, Inc. v. Perry,
    940 F.3d 1072 (9th Cir. 2019) .........................................................................19

Natural Resources Defense Council v. EPA,
    559 F.3d 561 (D.C. Cir. 2009)..........................................................................18

Natural Resources Defense Council v. National Highway Traffic
    Safety Administration,
    894 F.3d 95 (2d Cir. 2018) ..............................................................................10

New Jersey v. EPA,
    989 F.3d 1038 (D.C. Cir. 2021)..........................................................................8

New York Stock Exchange LLC v. SEC,
    2 F.4th 989 (D.C. Cir. 2021)......................................................................16, 17

NLRB v. SW General, Inc.,
    137 S. Ct. 929 (2017).......................................................................................21

Physicians for Social Responsibility v. Wheeler,
    956 F.3d 634 (D.C. Cir. 2020)............................................................................3

POET Biorefining, LLC v. EPA,
    970 F.3d 392 (D.C. Cir. 2020)..........................................................................15

Public Citizen Health Research Group v. Commissioner,
    740 F.2d 21 (D.C. Cir. 1984)...........................................................................18

*Public Citizen Inc. v. Mineta,
    343 F.3d 1159 (9th Cir. 2003) ......................................................................8, 17

*Singletary v. Howard University,*
   939 F.3d 287 (D.C. Cir. 2019)........................................................26

*Skinner v. United States Department of Justice,*
   584 F.3d 1093 (D.C. Cir. 2009)......................................................23

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016)..........................................................................2

*Texas v. United States,*
   No. 18-68, 2021 WL 3025857 (S.D. Tex. July 16, 2021) .................14

*TRW Inc. v. Andrews,*
   534 U.S. 19 (2001)..........................................................................26

*Tuaua v. United States,*
   788 F.3d 300 (D.C. Cir. 2015)........................................................19

*United States v. Mead Corp.,*
   533 U.S. 218 (2001)..........................................................................4

*Washington Alliance of Technology Workers v. United States.*
   *Department of Homeland Security,*
   892 F.3d 332 (D.C. Cir. 2018).....................................................9, 26

*Washington State Department of Social & Health Services v.*
   *Guardianship Estate of Keffeler,*
   537 U.S. 371 (2003)........................................................................15

*Zhang v. Slattery,*
   55 F.3d 732 (2d Cir. 1995) .............................................................19

## STATUTES AND REGULATIONS

5 U.S.C. § 552(a)(1).....................................................................10, 20

5 U.S.C. § 552(a)(1)(D) ..............................................................1, 9, 13

5 U.S.C. § 706(1) ............................................................................23

5 U.S.C. § 706(2) ............................................................................23

15 U.S.C. § 1828 .................................................................8, 17

44 U.S.C. § 1505(a) .............................................................1, 9

44 U.S.C. § 1507 ........................................................................9

1 C.F.R. § 1.1 ...........................................................................26

1 C.F.R. § 17.1 .........................................................................27

1 C.F.R. § 17.2(a) ...............................................................26, 27

1 C.F.R. § 17.2(b) ....................................................................25

1 C.F.R. § 17.2(c) .....................................................................25

1 C.F.R. § 17.6 .........................................................................26

1 C.F.R. § 17.7(a)(1) ................................................................26

1 C.F.R. § 18.13(b) ..................................................................23

1 C.F.R. § 18.17(a) ..................................................................25

## OTHER AUTHORITIES

54 Fed. Reg. 9670 (Mar. 7, 1989)....................................24, 25

Dear Colleague Letter from Russlynn Ali, Assistant Sec'y for Civ.
    Rts., U.S. Dep't of Educ. (Apr. 4, 2011),
    https://www2.ed.gov/about/offices/list/ocr/letters/colleague-
    201104.pdf ..........................................................................15

*Federal Register Act—Date of "Promulgation" of Law Enforcement
    Assistance Administration Regulations*, 1 Op. O.L.C. 12 (1977)......................12

Field Assistance Bulletin No. 2021-3 from Jessica Looman, Acting
    Adm'r of the Wage & Hour Div., U.S. Dep't of Lab. (Dec. 7,
    2021), https://www.dol.gov/sites/dolgov/files/WHD/
    legacy/files/fab_2021_3.pdf ..............................................14

Robert Newman, *The Effectiveness of an Unpublished Rule*, 1995
    Ann. Surv. Am. L. 1 (1995)..................................................................21

*Questions Arising in the National Archives Establishment Under the
    Federal Register Act*, 38 Op. A.G. 359 (1935)............................................11, 12

Ronald Reagan, *Memorandum Postponing Pending Federal
    Regulations* (Jan. 29, 1981), https://www.reaganlibrary.gov/
    archives/speech/memorandum-postponing-pending-federal-
    regulations...........................................................................................21

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| DACA | Deferred Action for Childhood Arrivals |
| FRA | Federal Register Act |
| OFR | Office of the Federal Register |
| OLC | Office of Legal Counsel |
| USDA | U.S. Department of Agriculture |

# INTRODUCTION AND SUMMARY OF ARGUMENT

In January 2017, the U.S. Department of Agriculture (USDA) formally approved a final rule amending the agency's Horse Protection Act regulations; posted that rule on a government website; and transmitted that rule to the Office of the Federal Register (OFR), which also posted the rule for public inspection. Because USDA had reached the culmination of its decisionmaking process and publicly conveyed notice of its action through official channels—twice—the final rule became law. The agency therefore violated the Administrative Procedure Act (APA) when it rescinded that final rule on January 23, 2017 without notice and comment and without a reasoned explanation for its abrupt change in position.

The government Defendants maintain that the final rule did not officially "issue" because it was not also published in the Federal Register, as required by 44 U.S.C. § 1505(a) and 5 U.S.C. § 552(a)(1)(D). But their attempt to elevate a publication requirement to a necessary precondition for valid agency action is unpersuasive. Defendants' argument is inconsistent with the text of the Federal Register Act (FRA) and the APA, with longstanding Executive Branch precedent and agency practice, and with a substantial body of case law. And it leads to the fundamental contradiction at the core of their case: that an unpublished rule can be *law* (because the agency can enforce it against private parties), and *not law* (because the agency is free to abandon it without notice and comment), at the very same time.

Defendants' attacks on Plaintiffs' independent APA claim against OFR—based on OFR's violation of its own scheduling regulation—fare no better. Their insistence that Plaintiffs "misunderstand" how the publication process works is simply a request for this Court to overlook what the regulation actually says. And Defendants' various attempts to keep the Court from reaching the merits of either claim—including a contrived standing argument that the district court readily rejected—fail as well. This Court should reverse.[1]

## ARGUMENT

## I.    USDA VIOLATED THE ADMINISTRATIVE PROCEDURE ACT

### A.    Plaintiffs Have Standing

Plaintiffs' APA claims against USDA challenge the agency's revocation of the Final Rule without notice and comment and without providing a reasoned explanation for its change in position. To establish Article III standing to bring those claims, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

---

[1]    Defendants note that on December 6, 2021, USDA "withdrew the 2016 proposed rule"—which had been pending as "inactive" since January 2017—and "stated that it would issue a new proposed rule." Defs.' Br. (DBr.) 17. Defendants do not suggest this development affects the present appeal, and Plaintiffs agree.

Defendants do not dispute that Plaintiffs have shown injuries in fact. The individual plaintiffs, for instance, are injured by their current inability to participate in the walking-horse industry as a competitor, trainer, breeder, or spectator, and they suffer an emotional injury from their awareness that soring is widespread under the current regime. *See* Babuszczak Decl. ¶¶ 19-21 (JA__-__); Quaintance Decl. ¶¶ 10-11, 13-15 (JA__-__); Stotsenberg Decl. ¶¶ 7, 10-13 (JA__-__); Coon Decl. ¶¶ 12-13 (JA__-__); Op. 7 n.1 (JA__); *see also Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009) (only one plaintiff need establish standing). Defendants only contest traceability and redressability, DBr. 26-28, and their arguments are unpersuasive.

1. Defendants argue that Plaintiffs are asserting claims based on "procedural injur[ies]," which are subject to a special standing inquiry. DBr. 26. But that argument applies only to Plaintiffs' claim that USDA revoked the Final Rule without notice and comment; Plaintiffs' distinct claim that USDA changed positions without a reasoned explanation is a substantive claim that the agency's decision was arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A). *See Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 638, 644-46 (D.C. Cir. 2020).[2]

---

[2] For this reason, Defendants' suggestion that USDA could have complied with its obligation to justify its shift in position merely by citing "the President's direction" (DBr. 28) is mistaken. *See Encino Motorcars v. Navarro*, 579 U.S. 211, 222 (2016) ("[A] reasoned explanation is needed for disregarding facts and circumstances that underlay . . . the prior policy." (citation omitted)).

In any event, Plaintiffs satisfy the procedural-injury standing test for both claims. "To establish traceability in a procedural-injury case," there must be "two links: (1) a connection between the omitted procedure and a government decision and (2) a connection between the government decision and the plaintiff's particularized injury." *Hawkins v. Haaland*, 991 F.3d 216, 224 (D.C. Cir. 2021), *petition for cert. filed* (U.S. Oct. 5, 2021) (No. 21-520). The plaintiff is *not* required to show that but for the procedural deficiency, the agency would have reached a different substantive result. *Id.* at 224-25. And the first "link" is also subject to a "relaxed redressability" standard: All Plaintiffs need to show is that adhering to the APA's requirements *could* have led the Trump Administration and USDA to leave the rule in place. *Id.* at 225.

Here, there is a clear "connection" between USDA's failure to fulfill its APA obligations and its withdrawal of the Final Rule. Engagement with public comment and reasoned deliberation—as the APA requires—could have led the Trump Administration and USDA to leave the Final Rule on the books rather than hastily revoking it. *See United States v. Mead Corp.*, 533 U.S. 218, 230 (2001) (notice-and-comment procedures are "'designed to assure due deliberation'" of regulatory action and "foster the fairness and deliberation that should underlie a pronouncement of such force" (citation omitted)).

Defendants nonetheless urge this Court to overlook USDA's procedural violations because they were done at the President's behest. They argue that because President Trump directed USDA to withdraw the Final Rule, and because presidential actions are not themselves reviewable under the APA, Plaintiffs must lack standing to challenge the action USDA took at the President's direction. DBr. 28. On that theory, the President could openly direct agencies to issue or rescind rules without following any of the APA's requirements—and to take undisputed changes in position without providing any explanation whatsoever—without anyone having standing to raise the APA violations.

That preposterous assertion is not the law. Courts regularly review agency action taken in response to presidential command. *See Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question."); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018) (courts can review agency action that implements a presidential directive). The President cannot insulate unlawful agency action from APA review by being the one to order it.

2. Defendants also argue that reinstating the Final Rule will not redress Plaintiffs' injuries (or, put differently, that there is not a sufficient connection

between the Final Rule's revocation and Plaintiffs' injuries). DBr. 29-30. The district court correctly rejected this argument below. Op. 7-11 (JA__-__).

As the court explained, the Final Rule would have accomplished "two primary objectives: (1) it would abolish the current system of [Horse Industry Organization] licensure and require all horse inspectors to be licensed by the USDA and APHIS, and (2) it would ban many more devices and substances often used in horse soring." Op. 8 (JA__). These changes, USDA found, "will strengthen enforcement of the HPA and regulations," "help to protect horses," and "eliminate the unfair competitive advantage that sore horses have over horses that are not sore." Compl. Ex. A, USDA, Horse Protection; Licensing of Designated Qualified Persons and Other Amendments 5 (JA__) ("Final Rule").

Defendants argue that the Final Rule is unlikely to "prevent[] all horse soring." DBr. 30. That is immaterial. "Redressability examines whether the relief sought . . . will *likely alleviate* the particularized injury alleged by the plaintiff." *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663-64 (D.C. Cir. 1996) (en banc) (emphasis added). As USDA itself found, "noncompliance under the existing regulatory framework is . . . pervasive." Final Rule at 32 (JA__); *id.* at 37-38 (JA__-__) (soring is "widespread" in the relevant industries). And Plaintiffs allege that their injuries stem from the *prevalence* of soring. *See, e.g.*, Babuszczak Decl. ¶¶ 4, 7-8, 11 (JA__-__) (alleging she was at a "large disadvantage against other trainers

who were soring their horses without suffering any consequences"); Quaintance Decl. ¶¶ 4-5, 8, 10 (JA__-__) (describing how "prevalent and persistent soring became," leading her to abandon showing and breeding); Stotsenberg Decl. ¶¶ 3, 10 (JA__-__).

It follows that Plaintiffs' injuries will be redressed by a decrease in soring's prevalence, even if the practice is not eradicated. Indeed, the individual plaintiffs have submitted sworn declarations stating that they will resume their prior industry activities if the Final Rule is enforced and that a reduction in soring at competitions will alleviate their emotional harms. *See* Babuszcak Decl. ¶¶ 17, 21 (JA__-__); Stotsenberg Decl. ¶¶ 10-13 (JA__-__); Quaintance Decl. ¶¶ 12-15 (JA__-__); Coon Decl. ¶¶ 9, 11-13 (JA__-__). That suffices to establish redressability. *See, e.g.*, *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 925 (D.C. Cir. 2008) (finding standing where court order would redress plaintiffs' injury "at least in part").

Defendants also argue that Plaintiffs' theory of standing is "'speculative'" because it depends on "third-party conduct"—how horse-show management and inspectors will respond to the Final Rule. DBr. 31 (citation omitted). But USDA itself predicted that the rule would bring about the result Plaintiffs predict: less soring. Final Rule at 5-6, 25-26 (JA__-__, __-__) (restricting action devices "will reduce instances of soring" and "help to promote fair competition"); *id.* at 115

(JA____) ("The rule will enhance enforcement of the HPA as compared to the current [private inspector] system.").

It is hardly "speculative" to assume a rule will operate as an agency intends it. And courts routinely find causation and redressability based on "the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019); *see also New Jersey v. EPA*, 989 F.3d 1038, 1048 (D.C. Cir. 2021). Cases like *Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015), merely illustrate that where a third party's reaction to challenged government action is *not* so predictable—and especially where the challenger's theory depends on "illogic"—standing may not be found. *See id.* at 21-23.

### B. USDA Violated The APA By Revoking The Final Rule

1. On the merits, Plaintiffs' position is straightforward. The Horse Protection Act grants USDA the authority to "issue" rules enforcing its mandates, 15 U.S.C. § 1828—a word that ordinarily means "send out or distribute officially" or "cause to . . . become available." Pls.' Br. (PBr.) 25 (quoting dictionary definitions); *see also Pub. Citizen Inc. v. Mineta*, 343 F.3d 1159, 1167 (9th Cir. 2003) (analyzing when a final rule "issue[s]" under a statute). And agency action is "final" at "'the consummation of the agency's decisionmaking process,'" when there is "nothing more for the agency to review or resolve" and it has "approv[ed]" the action. *Brotherhood of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972

F.3d 83, 99-100 (D.C. Cir. 2020) (citation omitted). It follows that USDA has issued a "rule" under the Act when, after the completion of the agency's decisionmaking process, an official approves the final rule and the agency "distributes" that rule to the public through an official channel. That moment was January 13, 2017—when USDA published the text of the Final Rule on its government website—or at the latest on January 19, when the rule was posted for public inspection.

Defendants, however, maintain that a rule "must be published in the Federal Register in order to be given legal effect." DBr. 22. They argue that this condition comes from the FRA and the APA. *Id.* at 23, 47. But although both statutes include Federal Register publication requirements, neither conditions a rule's *issuance* or *validity* on compliance with that requirement. *See* 44 U.S.C. § 1505(a); 5 U.S.C. § 552(a)(1)(D); PBr. 26-28, 33-36.

In fact, both the FRA and APA make clear that nonpublished rules *do* have legal effect. The FRA states that an agency rule becomes "valid" once it is posted for public inspection and that "person[s] subject to or affected by it" should be deemed to have constructive notice of its contents at that point. 44 U.S.C. § 1507. The FRA also provides that a rule may be enforced against a person with "actual knowledge" even before then. *See id.* And the APA—specifically, Section 552(a)— is in accord: Agencies can enforce unpublished rules against those with actual notice. *See Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892

F.3d 332, 347 (D.C. Cir. 2018) (explaining that "the failure to publish material in a rulemaking is cognizable only if . . . the aggrieved party did not have 'actual and timely notice of the terms thereof'" and "the aggrieved party is 'required to resort to, or [is] adversely affected by,' the unpublished material" (alteration in original) (quoting 5 U.S.C. § 552(a)(1)).

Crucially, Defendants do not disclaim the ability to enforce unpublished rules. *See* DBr. 6-7, 23, 48.[3] But this concession erodes the very foundation of their position. If an agency rule can be brought to bear against members of the public, it must carry the force of law. And if the agency can use that unpublished rule to compel adherence from third parties, it follows that the agency must be bound by that rule for APA purposes too.

Defendants also embrace the district court's understanding that the touchstone for whether a rule has issued is the agency's *intent*. *See* DBr. 22, 25, 39-40, 48-50. They do not ground that argument in a statute. Regardless, any such requirement

---

[3]    For this reason, statements in cases like *Natural Resources Defense Council v. National Highway Traffic Safety Administration*, 894 F.3d 95, 106 (2d Cir. 2018)—that a "regulation does not have legal effect . . . until it has been published in the Federal Register"—cannot help Defendants. Defendants cannot (and do not) agree with that broad articulation. *See* Defs.' MTD Reply 14, Dkt. 25 ("[T]here is no question that an agency may enforce a pre-publication rule against those who have actual knowledge of it." (internal quotation marks omitted)). The case is also distinguishable: The court was interpreting a judicial-review statute running from when a regulation is "prescribed," and the statute equated "prescribe" with "publish." 894 F.3d at 105-06.

was met here. USDA clearly intended to finalize the Horse Protection Act rule when a deputy undersecretary signed it, USDA posted the rule PDF on its website and issued a "bulletin" announcing a "final rule," and USDA submitted the rule to OFR. Compl. ¶¶ 82-83, 93 (JA__-__, __); Compl. Ex. C (JA__). In other words, at the time USDA "t[ook] all the steps necessary to issue the rule," USDA intended to treat it as final. *National Ass'n of Mfrs. v. NLRB* ("*NAM*"), 717 F.3d 947, 953 (D.C. Cir. 2013).

Defendants must therefore believe that USDA's *later* intent—on January 23, after the presidential transition—sufficed to change the Final Rule's status as a matter of law. But that would allow agencies to toggle a regulation's validity on-and-off based on changes in subjective intent. That cannot be right.

2. Defendants are equally unsuccessful in explaining away the Executive Branch precedent weighing heavily against them. The Attorney General has interpreted the FRA to hold that "documents required . . . to be published under section 5 of [the FRA] are . . . valid and operate as constructive notice to the persons designated as soon as they have been filed with [OFR] and made available for public inspection." *Questions Arising in the National Archives Establishment Under the Federal Register Act*, 38 Op. A.G. 359, 361 (1935). Defendants suggest that the opinion merely "restates the [FRA's] constructive notice provision." DBr. 40. But the Attorney General relied on that provision to reach the same conclusion Plaintiffs

do here: that "publication in the Federal Register is not essential to [agency documents'] validity." 38 Op. A.G. at 361; *see also id.* at 359, 362 (framing the question as whether it is "necessary that documents . . . be both filed with [OFR] and published in the Federal Register in order for such documents to be valid *or* to serve as constructive notice," and answering that two-part question "in the negative" (emphasis added)).

Defendants' response to the Office of Legal Counsel (OLC) opinion is even weaker. *See Federal Register Act—Date of "Promulgation" of Law Enforcement Assistance Administration Regulations*, 1 Op. O.L.C. 12 (1977). There, OLC determined—in the context of an agency's legislative rulemaking—that "filing with the Federal Register [for public inspection] constitutes promulgation of a regulation even though publication may not occur until a later date." *Id.* at 12. Defendants point out that the Office did not directly address the APA questions here. DBr. 40-41. Maybe not—but if a regulation is promulgated (in OLC's view), then the conclusion that the agency cannot revoke it without notice and comment necessarily follows. *Cf. NAM*, 717 F.3d at 953 (relying on the OLC opinion in a different context).

Defendants are likewise unable to reconcile their current position with the government's stance in other litigation. One week after the district court's decision in this case, the government told another district court that a rule has "issued" and

constitutes "final agency action" when it is "released to the public"—*before* Federal Register publication. Hr'g Tr. 42:10-18, 43:2-4, *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 20-1630-JEB (D.D.C.), Dkt. 46; PBr. 30-31. All Defendants can say is that the government did not make a representation about whether "the regulation was promulgated and final for enforcement purposes against the agency." DBr. 41 n.11. But that is a red herring: The government's argument in *Whitman-Walker* was that the rule was final and had issued by June 12—even before it was published on June 19—such that the government no obligation to modify the rule to take account of a new Supreme Court decision on June 15. That position is flatly inconsistent with Defendants' position here, which is that the Horse Protection Act Final Rule was *not* final, had *not* issued, and *could* be fully withdrawn, simply because it had not yet been published. So this is another instance in which the government is trying to have it both ways—proclaiming a rule "final" when that suits them, but not "final" when that label would constrain agency authority.

3. Defendants' position is inconsistent with government practice in another context too. Again, Defendants are arguing that because Section 552(a)(1)(D) requires publication of substantive rules, a rule that is not published can have no legal effect. DBr. 33, 47. But Section 552(a)(1)(D)'s publication requirement also applies to interpretive rules and policy statements. 5 U.S.C. § 552(a)(1)(D)

(requiring publication of "statements of general policy or interpretations of general applicability"); *see also National Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs* ("*NOVA*"), 981 F.3d 1360, 1365, 1373-78 (Fed. Cir. 2020) (en banc).  So if Defendants are correct, then an interpretive rule or policy statement is likewise not "issued" and can have no effect until published.

Does the government really believe that is right?  As the Department of Justice knows, federal agencies often issue interpretive guidance and policy statements without publishing them in the Federal Register.  *See* Br. for the United States 27-29, *Gray v. Wilkie*, 139 S. Ct. 2764 (2019) (No. 17-1679) (defending widespread reliance on interpretations appearing in manuals but not published in Federal Register).  Such unpublished interpretive rules and policy statements often govern major issues of national significance—including, for example, the Obama Administration's memorandum establishing the Deferred Action for Childhood Arrivals (DACA) program, and the Trump Administration's memoranda purporting to rescind that program.[4]

---

[4]    *Texas v. United States*, No. 18-68, 2021 WL 3025857, at *19 n.30 (S.D. Tex. July 16, 2021) (noting that memorandum establishing DACA was never published, in apparent violation of Section 552(a)(1)(D)); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1903-04 (2020); *see also, e.g.*, Field Assistance Bulletin No. 2021-3 from Jessica Looman, Acting Adm'r of the Wage & Hour Div., U.S. Dep't of Lab. (Dec. 7, 2021), https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/fab_2021_3.pdf (guidance on the Fair Labor

On Defendants' theory in this case, such unpublished interpretive rules and policy statements have not finally issued and have no effect. But that is obviously not how agencies and courts handle such unpublished agency actions in practice. Moreover, agencies routinely seek—and courts routinely grant—*Auer* or *Skidmore* deference to unpublished interpretive rules as authoritative, legally operative statements of agency interpretation.[5] Indeed, this Court recently held that an unpublished interpretive rule issued by the Environmental Protection Agency had sufficient "legal consequences" to render it "'final agency action'" as a "'settled agency position.'" *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 401, 404-06 (D.C. Cir. 2020) (citation omitted). That holding is entirely inconsistent with Defendants' current argument that unpublished rules are—by definition—not final and operative.

So yet again, the government would have it both ways: It wants this Court to treat Section 552(a)(1)(D)'s publication requirement as a mandatory precondition for issuing a substantive rule (thereby giving agencies flexibility to withdraw

---

Standards Act's application to the H-2B visa program; never published); Dear Colleague Letter from Russlynn Ali, Assistant Sec'y for Civ. Rts., U.S. Dep't of Educ. (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (guidance on Title IX and sexual violence; never published).

[5] *See Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 278, 283-86 (2009) (granting *Auer* deference to unpublished memorandum); *Washington State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 385-88 (2003) (granting *Skidmore* deference to unpublished manual); *NOVA*, 981 F.3d at 1365, 1381-82 (noting that Department of Veterans Affairs often seeks *Auer* deference to unpublished manual provisions).

unpublished rules without notice and comment), while ignoring that requirement when it comes to unpublished interpretive rules and policy statements. But Section 552(a)(1)(D) requirement treats substantive rules, interpretive rules, and policy statements the exact same way—although all must be published, a failure to publish is not a basis for denying that the rule has issued or has effect.

4. Defendants' attempt to wave away the other judicial authority undermining their position is also unconvincing. In *NAM*, for example, this Court relied on the FRA to hold that the date of "filing" a rule for public inspection is the date for "testing the validity" of the agency's action. 717 F.3d at 953-54 & n.5. Defendants dismiss *NAM* as a case about an agency's quorum—but the decision's underlying logic is that the agency "had taken all the steps necessary *to issue the rule*" by the public-inspection date. *Id.* at 953 (emphasis added). And when faced with *Arlington Oil Mills, Inc. v. Knebel*, 543 F.2d 1092 (5th Cir. 1976)—which squarely holds that an unpublished rule issued in a press release requires notice and comment before rescission, *id.* at 1099-100—Defendants just ask this Court to ignore that holding and assume the Fifth Circuit had other motivations. DBr. 39 n.9.

At the same time, Defendants contend that Plaintiffs' position contravenes "decades of administrative law precedent." DBr. 33 (capitalization altered). But they overplay their hand. For instance, *New York Stock Exchange LLC v. SEC* notes that in the context of a judicial-review deadline tied to a rule's "promulgation" by

the Securities and Exchange Commission, "promulgation" means Federal Register publication. 2 F.4th 989, 991-92 & n.1 (D.C. Cir. 2021); *see also Milice v. Consumer Prod. Safety Comm'n*, 2 F.4th 994, 999-1000 (D.C. Cir. 2021) (same result for another judicial-review statute using "promulgation"). These cases employ a "default" rule, from *Horsehead Resource Development Co. v. EPA*, 130 F.3d 1090 (D.C. Cir. 1997), that "[i]f the agency does not define the term by regulation and if the statute supports (or at least does not foreclose) the interpretation, 'promulgation'" means "publication in the Federal Register." *Id.* at 1093. But *Horsehead* derived that rule from another case, *National Grain & Feed Association v. OSHA*, 845 F.2d 345 (D.C. Cir. 1988) (per curiam). And *National Grain* reached its understanding about what "promulgation" meant in part because that statute used *both* "promulgated" and "issued," and the court believed the former needed to mean something different from the latter; notably, the agency had (by regulation) defined "issued" to mean when a rule is "filed" at OFR. *See NAM*, 717 F.3d at 953-54 (pointing this out). In any case, the Horse Protection Act uses "issue"—not "promulgate." 15 U.S.C. § 1828; *see also Mineta*, 343 F.3d at 1164-68 (holding that

a rule "issued" on date of public inspection—not Federal Register publication—and relying on ordinary meaning of "issue").[6]

At most, the cases' nuanced approaches to when a rulemaking should be deemed "complete" for various purposes indicates that the inquiry may be context-specific. *See American Petroleum Inst. v. Costle*, 609 F.2d 20, 23-24 (D.C. Cir. 1979) (per curiam) (date of "promulgation" for purposes of administrative record closure is the date rule is signed and publically released); *NAM*, 717 F.3d at 953 (noting that "the question when a rule is eligible for judicial review is not the same as the question posed in this case"). And here, the question is when an agency has finalized its action such that it cannot reverse course without going through notice and comment and explaining why. It makes good sense that this juncture should track the point at which the rule can be enforced. And that point—according to the FRA and APA—is public release, not Federal Register publication.

5. Defendants also rely on *Kennecott Utah Copper Corp. v. United States Department of the Interior*, 88 F.3d 1191 (D.C. Cir. 1996). But they do not dispute

---

[6] Defendants' other cases are distinguishable as well. For instance, *Natural Resources Defense Council v. EPA*, involved an agency's failure to include particular language in *an actual rule* (as opposed to a preamble). 559 F.3d 561, 564-65 (D.C. Cir. 2009). And *Public Citizen Health Research Group v. Commissioner*, the agency had approved only a "proposed regulation" and sent it to the Office of Management and Budget for additional review. 740 F.2d 21, 26, 32-33 (D.C. Cir. 1984). Neither case considered the question presented here.

that the document in *Kennecott* was never publicly released by the agency and never posted for public inspection by OFR. *See id.* at 1200-01, 1206. Defendants argue that these facts were likely immaterial to the *Kennecott* court's resolution of the industry petitioners' APA claim. DBr. 44-45. But the Ninth Circuit reads the decision the same way Plaintiffs do: to hold that "an agency could withdraw regulations that were submitted to the Office of the Federal Register at any time *up until* the regulations were made available for public inspection." *Natural Res. Def. Council, Inc. v. Perry*, 940 F.3d 1072, 1077 (9th Cir. 2019) (emphasis added).

*Kennecott* rejected only the argument that "whenever agencies propose rules, receive comments from the public, and *internally approve* a draft version of the final regulations," they may not change course. 88 F.3d at 1208 (emphasis added). The decision should not be read to address facts and arguments not before it. *See Tuaua v. United States*, 788 F.3d 300, 304-05 (D.C. Cir. 2015).[7]

6. Defendants also spend a considerable portion of their brief tearing down strawmen. Plaintiffs' position is not that Federal Register publication is a "meaningless step." DBr. 23. Nor are Plaintiffs claiming that Internet publication

---

[7]    Defendants argue that *Chen v. INS*, 95 F.3d 801 (9th Cir. 1996), and *Zhang v. Slattery*, 55 F.3d 732 (2d Cir. 1995), reached the same result as *Kennecott*. DBr. 45-46. But those decisions were focused on whether the rule at issue ever became "effective" and enforceable in court (because its effective date was tied to Federal Register publication)—not the APA issues presented here. *See* PBr. 46-48.

can substitute for the Federal Register under Section 552(a)(1). *Id.* at 47. Agencies must fulfill the Federal Register requirement if they wish to enforce their rule against those without actual knowledge of its existence. *See Morton v. Ruiz*, 415 U.S. 199, 233 (1974) (the "sanction" for nonpublication is an inability to generally enforce the rule); *Kennecott*, 88 F.3d at 1203. But that is not the same thing as saying that Federal Register publication is a necessary prerequisite for a rule to issue and thereby become law.

For the same reason, Defendants' suggestion (at 47) that Plaintiffs' position would eliminate the 30-day waiting period in Section 553(d) misses the mark. Plaintiffs are arguing that after public release, *the agency* is not free to renege on a final rule; again, if a rule is never published, the agency will be unable to generally enforce it. The same goes for Defendants' claim that Plaintiffs' position renders other exceptions to the publication requirement meaningless. DBr. 50. Plaintiffs are not denying that Federal Register publication is required "for the guidance of the public"—obviously, it is. 5 U.S.C. § 552(a)(1). Plaintiffs are arguing that this publication requirement is not a condition of *legal validity*.

Defendants mischaracterize Plaintiffs' position in other respects too. Plaintiffs are not claiming that "every unpublished proposal that has completed agency review is . . . effective," nor that the Final Rule became law upon signing. DBr. 23, 32. Public release through an official channel is required. *See* PBr. 24-25.

Nor do Plaintiffs dispute that agencies have discretion to abandon proposed rulemakings or not initiate a rulemaking at all. But none of the cases Defendants cite for any of these undisputed propositions (*see, e.g.*, DBr. 35), stands for the very different idea that an agency can abandon a rule it has already deemed "final" and released to the public.

7. Finally, Defendants fall back on an argument that incoming presidents have been doing this "[f]or decades." DBr. 21. But the practice of withdrawing *finalized* rules from publication only dates to President Clinton.[8] In any event, "[p]ast practice does not, by itself, create power." *Medellín v. Texas*, 552 U.S. 491, 531-32 (2008) (alteration in original) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)). Nor has the Executive Branch's position been consistent in this area. *See supra* at 11-13.

Once an agency reaches the culmination of it decisionmaking process and officially releases a final rule to the public, the rule has issued and becomes law. The Final Rule meets that test, and USDA violated the APA by revoking it.

---

[8] *See* Robert Newman, *The Effectiveness of an Unpublished Rule*, 1995 Ann. Surv. Am. L. 1, 1 n.2 (1995); Ronald Reagan, *Memorandum Postponing Pending Federal Regulations* (Jan. 29, 1981), https://www.reaganlibrary.gov/ archives/speech/memorandum-postponing-pending-federal-regulations (not directing withdrawal of regulations pending at OFR); *cf. NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017) (rejecting argument that executive practice dating to 1998 should be given "significant weight").

## II. THE OFFICE OF THE FEDERAL REGISTER UNLAWFULLY DELAYED THE FINAL RULE'S PUBLICATION

The district court also wrongly dismissed Plaintiffs' independent claim based on OFR's violation of its scheduling regulation. None of Defendants' arguments show otherwise.

### A. Plaintiffs Have Standing

The district court dismissed Plaintiffs' APA claim against OFR on the theory that Plaintiffs lacked an injury from the scheduling violation. The court believed (incorrectly) that USDA still would have been able to withdraw the rule after President Trump's inauguration even had OFR scheduled the rule's publication on the correct date (January 23). Op. 24-25 (JA__-__); *see* PBr. 51-53 (explaining that OFR's Document Drafting Handbook would have required USDA to request withdrawal *before* noon on January 20, and that the Regulatory Freeze Memo instructed agencies to conduct withdrawals "consistent with OFR procedures"). Defendants do not defend the court's analysis; indeed, they candidly acknowledge that they withdrew this standing argument from their motion to dismiss. DBr. 52 n.14. Bizarrely, Defendants then accuse Plaintiffs of forfeiting their response to that argument. *Id.* at 52-53. But because Defendants eliminated the argument from their motion, Plaintiffs had no need to address it until it formed the basis of the district court's decision.

The standing argument Defendants do advance fares no better. They argue that Plaintiffs' injury is not redressable because a court cannot order OFR to publish the Final Rule. DBr. 53 (citing *Kennecott*). That is not correct: The APA grants courts authority to "set aside" agency action (here, OFR's withdrawal of the Final Rule from publication), as well as the authority to "compel agency action unlawfully withheld" (publication of the Final Rule). 5 U.S.C. § 706(1)-(2). *Kennecott* held only that 5 U.S.C. § 552(a)(4)(B) (the Freedom of Information Act) does not authorize a court to order publication; *Kennecott* did not address whether Section 706 grants that authority. *See* 88 F.3d at 1202-03. And contrary to Defendants' suggestion (at 54), there is no impediment to OFR complying with a publication order, because the document remains in OFR's files. *See* 1 C.F.R. § 18.13(b).

## B. Plaintiffs Are Within The Zone Of Interests Protected By The Federal Register Act

Defendants also argue that Plaintiffs are not within the zone of interests protected by the FRA and cannot sue under the APA to enforce its implementing regulations. Defendants failed to raise this argument below, and it is forfeited. *See Skinner v. U.S. Dep't of Justice*, 584 F.3d 1093, 1100 (D.C. Cir. 2009).

But the argument need not detain the Court long. An injured plaintiff is outside a statute's zone of interests only when the plaintiff's "'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Match-*

*E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (noting that this standard is "not meant to be especially demanding") (citation omitted).

And *Kennecott* already establishes that Plaintiffs fall within the FRA's zone. In holding that an entity could challenge OFR's failure to publish a rule that would have benefited it, *Kennecott* explained that "Congress enacted the [FRA] to address the disorderly way in which the federal government was . . . distributing its regulations" and that the statute was intended to "protect regulated entities from harm—including economic injury—they might suffer because of the government's failure to publish duly-approved regulations." 88 F.3d at 1204-05; *see also* 54 Fed. Reg. 9670, 9670 (Mar. 7, 1989) (OFR's regulations are "intended to improve publication procedures and better serve agencies *and the public*" (emphasis added)). Here, Plaintiffs may bring suit to vindicate that same interest.

## C.     OFR Unlawfully Delayed Publication Of The Final Rule

On the merits, Defendants argue that OFR did not violate its regulations by scheduling the Final Rule for publication on January 24, 2017. They are wrong.

The relevant regulation states that "[e]ach document received by 2:00 p.m. which meets the requirements of this chapter *shall* be assigned to the regular schedule," and each document "received after 2:00 p.m. which meet[s] the requirements of this chapter *shall* be assigned to the next working day's regular

schedule." 1 C.F.R. § 17.2(b) (emphasis added).  That "regular schedule" requires a document to be filed for public inspection two business days after receipt, and published one day after that (with one day added for a holiday).  *Id.* § 17.2(c).  Because the Final Rule was posted for public inspection on Thursday, January 19, it should have been published on Monday, January 23.  PBr. 50.[9]

Defendants argue that Plaintiffs "misread[]" Section 17.2 to impose a "rigid, mandatory scheduling process."  DBr. 56.  But Section 17.2(b) uses the word "shall"—which means the requirement is "mandatory" and "creates an obligation impervious to . . . discretion."  *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998); *see also Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020).  And in drafting its regulations, OFR did not use the word lightly.  In the same rulemaking that produced the current Section 17.2, OFR rejected "shall" in favor of "should" in another regulation (1 C.F.R. § 18.17(a))—because OFR recognized there were circumstances in which "requiring" the action at issue would not be appropriate.  54 Fed. Reg. at 9672.

In response, Defendants point to other provisions stating that OFR must assign a document a publication date before filing it for public inspection.  DBr. 57 (citing

---

[9]    Defendants dispute Plaintiffs' allegation that USDA submitted the Final Rule "around January 16."  Compl. ¶ 93 (JA__); *see* DBr. 57 n.15.  But if Defendants are correct that USDA submitted the rule on or before January 13, that renders OFR's scheduling violation all the more egregious.

1 C.F.R. §§ 1.1, 17.2(a), 17.6). True, but irrelevant. If Defendants are arguing that these order-of-operation provisions give OFR the freedom to select whatever publication date it likes, *see* DBr. 58, subsections 17.2(a) and (b) preclude that understanding. At the very least, Defendants' reading would render much of Section 17.2 superfluous, in violation of a "cardinal principle" of interpretation. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

Defendants next speculate that the Final Rule might not have qualified for the regular schedule because its length could have required "'extraordinary processing time.'" DBr. 59-60 (quoting 1 C.F.R. § 17.7(a)(1)). But Plaintiffs get the benefit of every reasonable inference on a motion to dismiss, not Defendants. *See Singletary v. Howard Univ.*, 939 F.3d 287, 302 (D.C. Cir. 2019).[10] And Defendants' theory that "processing" the Final Rule might have required a deferred schedule—but specifically, a schedule with more time between the public-inspection and publication stages—does not hold up. As *Kennecott* explained, OFR "processing" happens on the front end, before a document is posted for public inspection. *See* 88 F.3d at 1205 ("confidential processing" period "take[s] place *after* an agency

---

[10] Defendants also argue Plaintiffs had to specifically allege that no circumstance warranting a different schedule was present. DBr. 58-59. They cite no authority supporting such a "gotcha" pleading standard; in *Washington Alliance*, the plaintiff alleged that the agency violated Section 552(a)'s publication requirement without alleging that the material at issue was even required to be published. *See* 892 F.3d at 347.

transmits a document to the OFR and *before* the OFR makes the document available for public inspection"; that is when OFR "reviews and edits documents to ensure that they are properly formatted"). OFR regulations say the same thing. 1 C.F.R. § 17.1 ("[E]ach document shall be held for confidential processing until it is filed for public inspection."); *id.* § 17.2(a) (a document shall be filed for public inspection "only after it has been . . . processed").

Plaintiffs have stated a valid claim that OFR unlawfully delayed the Final Rule's publication. That claim should go forward.

## CONCLUSION

The decision below should be reversed.

Date: February 11, 2022

Respectfully submitted,

/s/ *Caroline A. Flynn*

| | |
|---|---|
| Kimberly D. Ockene | Caroline A. Flynn |
| Ralph E. Henry | L. Allison Herzog |
| THE HUMANE SOCIETY OF THE | Roman Martinez |
| UNITED STATES | Julia A. Hatcher |
| 1255 23rd Street, NW | LATHAM & WATKINS LLP |
| Washington, DC 20037 | 555 Eleventh Street, NW |
| (202) 285-1388 | Suite 1000 |
| kockene@humanesociety.org | Washington, DC 20004 |
| | (202) 637-2200 |
| | caroline.flynn@lw.com |

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,
TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1.       This document complies with the type-volume limit of Fed. R. App. P.

32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App.

P. 32(f), this document contains 6,479 words, as determined by the word-count

function of Microsoft Word 2016.

2.       This document complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this

document has been prepared in a proportionally spaced typeface using Microsoft

Word 2016 in 14-point Times New Roman Font.

*/s/ Caroline A. Flynn*
Caroline A. Flynn